**Charlie B. WRIGHT et al., Appellants,**

v.

**The STATE of Oklahoma, Appellee.**

**No. A–16446.**

Court of Criminal Appeals of Oklahoma.

Jan. 10, 1973.

Rehearing Denied Feb. 2, 1973.

H. A. Leatherman, Oklahoma City, for appellants.

Larry Derryberry, Atty. Gen., Michael D. Tinney, Asst. Atty. Gen., for appellee.

## OPINION

BLISS, Judge:

Appellants, and each of them were charged, tried, and convicted by a jury in

the District Court of Oklahoma County, Oklahoma with the offense of Riot. Wright and Clark were convicted after former conviction of a felony and sentenced to serve terms of twenty-five (25) years in the state penitentiary, while Houseley was convicted as a first offender. From those judgments and sentences, this timely conjoint appeal has been perfected.

At the trial, Floyd Wallis testified he was 19, and that on the evening in question, April 17, 1970, he had just pulled up in front of his brother-in-law's house at 1512 South Pettee in Oklahoma City shortly before midnight. In the car with him at the time were his wife, Betty, and a friend, Roger Lineman.

He testified that while they were sitting in the car, a carload of boys pulled up behind him, exited their car, and came to his vehicle and asked him if he knew a person by the name of Rich Ward. He testified he left his vehicle, stating he did not know a Rich Ward, and at that point, he was jumped by an estimated seven assailants, and a fight started. He testified he hollered to his brother-in-law for help, that during the melee he was struck on the left arm by a piece of angle iron, and that he remembered being on the ground several times. He testified he was cut on his arm and had knots on his head, kick marks on his legs, and one on his back. He testified that while he was lying on the ground he saw several of his assailants get into what he told officers was a 1955 or 1956 red and white Chevrolet, that he was not certain of the color, and that he had kicked out the driver's side window in the fight. He testified his brother-in-law, James Ronnie Wagoner, was lying in the street with a big gash on his neck, and part of his ear torn off. Wallis said Lineman helped him get Ronnie into the house, and that the assailants then came back, attempted to get into their house, and kicked out the windows in Wallis's automobile.

After first stating he could not make a definite statement, Wallis identified Wright as one of his assailants, indicating that he had met Wright two and one-half years earlier, and stated the other two defendants in the courtroom had the same description and same size, but indicated there were more assailants than were present in the courtroom. Cross-examination did nothing to reinforce Wallis's testimony, and he did state that he would not say under oath that he had ever seen the two defendants, Houseley and Clark before that day in the courtroom.

The brother-in-law, Wagoner, stated he was at home at approximately 11:45 p. m. on the date in question at 1512 Southwest Pettee when he heard a car honk outside, looked out the window, and saw it was his brother-in-law. He stated he saw a car pull up behind his brother-in-law's car and he saw six or seven people alight from the car carrying "pop bottles and stuff" behind their backs. He testified he looked for something with which to help his brother-in-law and then ran out toward the fight empty-handed. He testified he did not know who or what hit him, but that when he regained consciousness, part of one ear was missing, he had several head gashes which required 75 stitches to close, and a skull fracture.

Betty Wallis's testimony was substantially the same as that given by her husband, but she also was unable to identify any of the assailants, and she could not say for certain how many assailants there were. She testified she recalled seeing more than three people, and that they all jumped on her husband after asking him if he knew a person by the name of Richard Ward. She testified she saw Ronnie Wagoner come out of the house, run across the street, and that they all jumped on him. She described the vehicle used by the assailants as a two-tone 1955 or 1956 Chevrolet. She testified on cross-examination that she knew Charlie B. Wright, but did not recall seeing him there the night of the fight. She did state she recognized the individual in the blue shirt who came up to the auto and talked to her husband, but the transcript does not reflect whether it was Houseley or Clark.

Amy Lee Taylor testified that she was living at 1511 South Pettee on the date in question and was awakened by her son about 11:45 p. m., who told her that there was a fight occurring in the alley behind their house. She testified that she walked to the window, looked out, and saw Mr. Wagoner come running out of his apartment, and at the same time, saw a "whole bunch of boys out in the alley fighting with another man." She testified that just as Mr. Wagoner came out the door, one of them hit him with a bottle of some kind, and that the bottle shattered and knocked him down. She testified that every time he tried to get up, four or five boys kept hitting him with bottles, and that one had something that looked like a piece of iron or a long piece of metal.

She testified that she went down the stairs and out the back door and got a good look at all of the participants in the fight. She testified she tried to help Mr. Wagoner and that once they got him into his apartment, all of the boys came back to the door and started to smash it in. She identified all three of the defendants as having participated in the fight. She testified on cross-examination that she had seen the same group of boys in her front yard before dark, a little after 6:00 o'clock on the night in question. She stated they were riding around in a car, and that they got out several times, and they were talking to neighborhood children. She also stated there appeared to be seven or eight persons involved in the fight, besides Mr. Wagoner and his brother-in-law. She testified that the area where the fight took place was well lighted.

Mrs. Taylor's son, Keith, testified that he was a thirteen-year-old seventh grader, and that he was watching television at approximately 11:45 p. m., when he heard a car honk and went to look out the window. His testimony concerning the fight was substantially similar to that of the other prosecution witnesses. He testified further that he could identify Charlie Wright as one of the participants in the fight, having seen him at other occasions around the area, and also, that he called the police. He testified, as did his mother, that he could identify two other participants in the fight, but that they were not present in the courtroom at the trial.

Officer Harold Behrens testified that he and his patrol partner received a radio assignment to a gang fight at approximately 12:15 a. m. in the 1500 Block of South Pettee. The officer described the fight scene, the automobile with the windows broken out, and the two victims who had been beaten up. He testified to summoning an ambulance, observing the damage to the door of the Wagoner residence apparently where the attempt to gain entry had been made. The officer testified approximately 45 minutes later they were patrolling the 1500 Block of South Pennsylvania and observed two vehicles, one a 1956 two-tone Chevrolet, and the other a 1957 Oldsmobile, and that there was a large group of boys in and around the two vehicles. The officer testified the Chevrolet was green and white, and the Oldsmobile was red and white.

The officer testified that they stopped, talked to some of the subjects and placed seven of the boys under arrest for loitering. He also stated that at that time he noticed the 1956 Chevrolet had the driver's side window broken out of it, that there were glass splinters in the floorboard and on the seat of the vehicle, and that lying on the back seat of the vehicle he found a long piece of pipe or an I-beam of some sort which appeared to have blood on it. He testified the pipe was impounded as evidence, and stated that the Chevrolet was the car normally driven by one of the defendants, Bobby Clark. He identified Clark as being one of the three defendants in the courtroom. He also stated that the defendants Charlie Wright and Rex Houseley were present and that Wright had what appeared to be blood stains on his clothing and scratch marks on his hands. The officer stated all three of the defendants had blood on their clothes and scratch marks on their arms and hands.

On cross-examination the officer testified that no effort was made to lift any fingerprints from the metal bar and that no attempt was made to determine whether or not the substance on the bar and on the clothing was, in fact, blood. The officer stated on cross-examination that most of the witnesses at the scene were fairly certain they had seen either a blue and white or a green and white vehicle leave the scene.

Officer Gene Christian testified that he was assigned to the detective division and that he made an investigation the day following the incident. He testified he interviewed the three defendants in the city jail, and that at that time the defendant Clark had on a dark blue shirt. He stated that Clark had a small cut on his right arm and minor scratches and bruises on his right arm. He identified Clark in the courtroom. He testified the defendant Wright also had blood on the sleeve in front of his shirt, and that Houseley appeared to have a minor bruise on his face.

The defense called as its only witness Robert Settle, who testified that he is the manager of the C & J Auto Parts at 2521 South May, and that he employed Charlie Wright as a driver and delivery man at his place of business, and that Wright was employed in his place of business on the day in question. He testified that Wright's hours were from 8:00 in the morning until 6:00 in the evening.

The defense stipulated that Charlie Wright and Bobby Clark were previously convicted as co-defendants in a case of Knowingly Concealing Stolen Property, which resulted in three-year suspended sentences for each man.

## I.

■ The appellants assigned twelve (12) errors which they consolidate under five propositions, the first of which is that the appellants were entitled to sufficient time between the preliminary hearing and the trial to obtain a copy of the preliminary hearing transcript. Where due diligence is shown in an effort to acquire same and a showing as to its need is made, it is then prejudicial error to force a defendant to trial without a preliminary hearing transcript and effective counsel.

The record reflects that while the attorney for the appellants represents all three appellants on appeal, he sought to represent only one of the defendants, Wright, on the trial. The record reflects that Wright was represented by the Public Defender at his preliminary hearing and at the trial, but that the attorney for the appellants was hired the night before the trial. The Public Defender announced he was ready to proceed to trial in Mr. Wright's behalf, and the court denied a motion for a 24-hour continuance on behalf of the hired counsel to obtain a preliminary hearing transcript.

■ A careful examination of the record fails to convince this Court that the man whom appellant Wright attempted to hire as counsel actually showed due diligence in an effort to acquire a preliminary hearing transcript, or made an adequate showing as to any need for that transcript, or showed that the non-availability of that transcript at the trial actually created any prejudice for that particular defendant or either of the other two defendants.

The record reflects that the attorney, Leatherman, requested 24 hours in which to obtain a preliminary hearing transcript, but he made no indication as to whether or not he could actually obtain such a transcript within 24 hours. Further, the record reflects that the District Attorney's office had a copy of the transcript in the courtroom at the time and it would have been a simple matter for Mr. Leatherman to request that the court order or require the State to provide the defendant with a copy of same. Further, the Public Defender who represented the appellant Wright at the preliminary hearing two weeks prior to trial was present in the courtroom and the record indicates he was sufficiently familiar with the preliminary hearing testimony to have properly im-

# 512

peached witnesses from his recollection if such became necessary. We note, also, that he apparently saw no need to order a preliminary hearing transcript for impeachment purposes.

As Mr. Leatherman correctly points out, his position is in direct contradiction to a local court rule that trial counsel will not be permitted to be released later than ten (10) days prior to the setting of a case for trial. Counsel poses the question why the trial judge did not sever the defendants and continue the matter as to the appellant Wright. The record reflects that no motion for severance was made on behalf of any of the appellants, and, in fact, hired counsel for the other two appellants announced ready for trial, as did the Public Defender assigned to the appellant Wright. It is settled law in the state of Oklahoma that motions for severence, as well as motions for a continuance, are addressed solely to the sound discretion of the trial judge, whose denial of such motions will not be disturbed on appeal unless there is a clear showing of an abuse of discretion. Ferguson v. State, Okl.Cr., 489 P.2d 523 (1971); Brumbelow v. State, Okl.Cr., 488 P.2d 1298 (1971).

The record further reflects that appellant Wright's newly-hired attorney made no effort to comply with the statutory requirements fundamental to a motion for continuance. 22 O.S.1971, § 584; 12 O.S. 1971, § 668. We have previously held that the failure of an affidavit for continuance to comply with the requirements of § 668, *supra*, renders a request for continuance fatally defective. Snow v. State, Okl.Cr., 453 P.2d 274 (1969); Crosswhite v. State, Okl.Cr., 317 P.2d 781 (1957). In view of the foregoing, we find the trial court committed no error, did not abuse its discretion, and thus the first proposition is without merit.

## II.

The second proposition urges that appellant Wright was denied counsel of his own choice in violation of his constitutional rights.

After examining the record in this case, as well as the authorities submitted by the appellant, Wright, we must conclude that under the facts and circumstances in this particular case that this proposition is likewise without merit. Appellant's brief on this particular point ends with the bald, conclusatory statement that: " * * * And, under all the circumstances the refusal to allow a continuance by the trial judge amounted to, among other things, an abuse of discretion because the defendant was prejudiced thereby." As we noted above, we found no abuse of discretion and found no prejudice offered on behalf of the defendant.

In support of this proposition appellant cites three cases: Abel v. State, Okl.Cr., 383 P.2d 710 (1963); Application of Kinnison, Okl.Cr., 335 P.2d 645 (1959); and Jackson v. State, Okl.Cr., 316 P.2d 213 (1957). The holdings of those cases, that a defendant is entitled to the aid of counsel of his own choice when able to employ same, a right not limited to the trial, but extended to all stages of the proceeding, in that a defendant who is able to employ counsel has the right to be represented by counsel of his own choice and the denial of such personal right is a fundamental error, is not contested by the State in their brief. However, a close reading of the three cases cited by appellant, as well as the case offered by the State for its contention, coupled with independent research by this Court, has failed to reveal a fact situation which approximates the case at bar.

*Abel, Kinnison,* and *Jackson* all involve pleas of guilty, and appeals therefrom, or appeals from denied applications to withdraw the pleas of guilty. In *Kinnison* and *Jackson* there was no counsel present with the defendant at the time the plea was entered. In both of those cases, Judge Brett, writing for the Court, takes particular note of the undue haste involved in accepting the pleas of guilty. For example, in the *Kinnison* case a total of four days elapsed between the commission of the crime and the incarceration of the defendant in the state penitentiary. The *Abel* case, *supra*,

which most closely approximates the facts in the case at bar, indicates the defendant was returned from a mental examination only one day prior to entering his plea, had never formally been arraigned or entered his plea, and did not have a trial date set. Once again, these facts and circumstances do not square with the case before us.

The State relies upon Thompson v. State, Okl.Cr., 462 P.2d 299 (1969) for the proposition reflected in the First Syllabus by the Court:

> "Although every accused has the right to counsel, he is not entitled to a further continuance in his trial to secure private counsel of his choice where he has been represented since inception of the charge by retained counsel or court-appointed counsel and appears for trial with court-appointed counsel adequately prepared to defend accused."

As in the cases cited by the appellant, we also agree that the proposition stated by the Attorney General is a proper statement of the law, and while it appears to be controlling in this particular case, it, too, fails to square with the facts before us. In *Thompson, supra,* in the several months between the time of the preliminary hearing and the time of the trial in district court, Thompson was represented by at least nine attorneys, some private and some court-appointed, and he again sought to change his counsel at the time of trial.

■ After considering the cases submitted in both briefs, conducting independent research, and carefully examining the record before us, this Court cannot agree *in this particular case* that the defendant was denied any constitutional right or was not adequately represented.

### III.

Proposition three is directed toward the appellants Bobby Dan Clark and Rex Allen Houseley, who assert that because they were represented by the same attorney on the trial, a conflict of interest existed because the jury had to fix penalty for more than one defendant and a waiver of the right to effective representation of counsel could not be presumed or implied from their silence, and therefore those two appellants were denied their constitutional rights.

■■ Appellant cites as authority People v. Chacon, 69 Cal.2d 765, 73 Cal.Rptr. 10, 447 P.2d 106 (1968) which involves a case in which the court appointed an inexperienced public defender to represent four defendants in a capital case. We need only observe that on the trial, the appellants Houseley and Clark were represented by privately retained counsel of their own choice, one Carroll Samara, an Oklahoma City attorney, known to this Court to be extremely well-versed in the trial of criminal cases. We hold that these defendants cannot now be heard to complain of any error committed by counsel whom they selected and retained. Further, we would be more inclined to adopt as persuasive a Tenth Circuit holding which came down just two days after the *Chacon* case and which was cited by the State for the proposition that joint representation of co-defendants does not constitute a denial of counsel, unless a conflict of interest or prejudice results from such procedure and that while the appointment of separate counsel for *indigent* co-defendants is desirable, failure to do so is not inherent error. Fryar v. United States, 404 F.2d 1071 (10th Cir., 1968) U.S. cert. denied, 395 U. S. 964, 89 S.Ct. 2109, 23 L.Ed.2d 751 (1969). The record in this case does not reflect such a conflict of interest or prejudice resulting from such joint representation.

### IV.

Appellant's proposition four urges the court erred in overruling the appellant's motion to quash the information before any jurors were sworn or evidence adduced and gave improper instructions and was without jurisdiction to try the defendants for a felony based on the information.

■ The court committed no error in overruling appellant's demurrer since the

demurrer was oral and fails to comply with the statute, 22 O.S.1971, § 505.

> The statute is clear and unambiguous:
> "The demurrer must be in writing, signed either by the defendant or his counsel, and filed. It must distinctly specify the grounds of the objection to the indictment or information, or it must be disregarded."

The record before us fails to reflect any compliance with the above-cited statute; therefore, the demurrer was defective.

■ Appellant's complaint as to the propriety of the instructions given is not properly before us for several reasons. The petition-in-error cites several assignments of error, none of which deal with instructions. The original record reflects no instructions were requested by the defendant and the transcript reflects that no objection was made to the instructions at the time they were given. Further, counsel's brief includes no citations of authority with regard to improper instructions. We have examined the instructions that were given and are of the opinion that those instructions generally cover the subject matter of inquiry. Thus, we find any objection to the instructions to be without merit considering the condition of the record. Lewis v. State, Okl.Cr., 433 P.2d 854 (1967); Schapansky v. State, Okl.Cr., 478 P.2d 912 (1971).

## V.

In the fifth and final proposition, appellant contends the court committed error in admitting certain evidence, a metal I-beam, claiming the I-beam was not sufficiently identified as the one used to injure the victim, and cites for that proposition Gresham v. State, Okl.Cr., 456 P.2d 119 (1969). Appellant's citation of that case is quite correct as far as it goes.

Judge Brett, writing for the Court, in Syllabus Number Two stated:

> "Before physical object allegedly taken in commission of burglary is admitted in evidence, it must be sufficiently connect-

ed with the crime itself by proper identification."

The appellant failed, however, to recite the balance of that Syllabus, which states:

> "However, it is not necessary that such identification should positively and indisputably describe such article. If it is sufficiently described to justify its admission in evidence, the lack of positive identification goes to the weight of such evidence rather than its admissibility."

■ We are of the opinion in this case, after reading the trial transcript, that the evidence complained of was sufficiently identified to justify its admission.

The balance of the arguments and the authorities marshalled by appellant under propositions four and five are devoted primarily to an attack on the sufficiency of the information in this case, an attack which is not wholly without merit.

Appellant further asserts that the evidence was insufficient to warrant the jury's finding of guilty and that the court erred in refusing to direct a verdict to find the defendant not guilty.

■ Appellant maintains that, at best, the information alleges a misdemeanor and therefore the court was without jurisdiction to try the case. As we pointed out earlier in proposition four, the appellant failed to make a proper attack on the information, that is, a written and filed demurrer, motion to quash, or motion to set aside the information. Although he orally demurred and moved to dismiss the informations on several occasions, the appellants did plead to the information and proceeded to trial. Failure to file a proper demurrer, or motion to quash the information is tantamount to filing no pleadings at all. It is settled law in Oklahoma that where no demurrer or motion to quash the information is filed, and a plea of "not guilty" is entered and a trial is had, the defendant waives any defect in the information, except that the court has no jurisdiction of the subject matter and that no public offense has been committed. Smith v.

State, 79 Okl.Cr. 151, 152 P.2d 279 (1944). Thus, it becomes necessary to determine whether or not the court had jurisdiction and whether or not a public offense had been committed.

■ The charging portion of the information in the instant case alleges the appellants "acting conjointly and together, in the county and state aforesaid, on the day and year aforesaid, then and there being, and did then and there wilfully, unlawfully, and feloniously in the immediate vicinity of 1512 South Pettee in Oklahoma City, in the said county and state, without authority of law, commit assault and riotous acts, by use of force and violence and threats to use force and violence, accompanied by immediate power of execution against diverse persons at the scene and in a manner adapted to disturb the public peace and incite public alarm, said defendant did effect a riot; * * *"

We find the charging portion of the information reflects all of the elements set out under 21 O.S.1971, § 1311, which defines riot:

"Any use of force or violence, or any threat to use force or violence if accompanied by immediate power of execution, by three or more persons acting together and without authority of law, is riot." Thus, we must also find that under the evidence in the case and the information that a public offense was committed.

Punishment for riot is set out under the following statute, 21 O.S.1971, § 1312:

"Every person guilty of participating in any riot is punishable as follows:

"1st.  If any murder, maiming, robbery, rape or arson was committed in the course of such riot, such person is punishable in the same manner as a principal in such crime.

"2nd.  If the purpose of the riotous assembly was to resist the execution of any statute of this State or of the United States, or to obstruct any public officer of this State or of the United States, in the performance of any legal duty, or in serving or executing any legal process, such person is punishable by imprisonment in the penitentiary not exceeding ten years and not less than two.

"3rd.  If such person carried at the time of such riot any species of firearms, or other deadly or dangerous weapon, or was disguised, he is punishable by imprisonment in the penitentiary not exceeding ten years and not less than two.

"4th.  If such person directed, advised, encouraged or solicited other persons, who participated in the riot to acts of force or violence, he is punishable by imprisonment in the penitentiary for not exceeding twenty and not less than two years.

"5th.  In all other cases such person is punishable as for a misdemeanor."

■ Appellants contend that they were convicted under the third sub-section of § 1312, when at most the information charges and they were convicted of section five, a misdemeanor, and that therefore the court was without jurisdiction to try that misdemeanor offense. It is settled law in Oklahoma that crimes are graded by the punishment which may be inflicted rather than the punishment which is inflicted. Further, we have specifically ruled that a conviction under § 1311 constitutes a felony conviction in Oklahoma. Swartzfeger v. State, 57 Okl.Cr. 92, 45 P.2d 550 (1935), Symonds v. State, 66 Okl.Cr. 49, 89 P.2d 970 (1939).

■ Appellant argues that the use of the weapon should have been pled in the information, and we agree that the better practice would have been for the District Attorney to have amended the information after the preliminary hearing and prior to trial, setting out the use of the weapon; but, under the facts and circumstances and the evidence in the case before us, we are unable to hold the failure to so amend the information constitutes prejudicial or reversible error. However, it would appear that the best interests of justice would be served by a modification of the sentence.

Inasmuch as this Court is powerless to modify a sentence below the statutory minimum, the conviction as to Rex Allen Houseley, who was sentenced to a term of two (2) years, is and the same is hereby affirmed.

As to appellants Wright and Clark, sentence will be modified downward from twenty-five (25) years, to terms of fifteen (15) years each.

BUSSEY and BRETT, JJ., concur.