**Lonnie C. JOHNSON, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**Nos. F–76–449, F–76–450.**

Court of Criminal Appeals of Oklahoma.

Nov. 22, 1976.

J. Leo Troy, Jr., McAlester, for appellant.

Larry Derryberry, Atty. Gen., Robert L. McDonald, Asst. Atty. Gen., for appellee.

## OPINION

BLISS, Judge:

Appellant, Lonnie C. Johnson, hereinafter referred to as defendant, and his co-defendant, Danny Parker, were charged, tried and convicted in the District Court, Pittsburg County, Cases Nos. F–75–176 and F–75–178, for the offenses of Kidnapping, After Former Conviction of a Felony, in violation of 21 O.S.1971, § 741. In Case No. F–75–176, the kidnapping of Kim Thomas, the jury returned a verdict fixing the defendant's punishment at twenty-five (25) years imprisonment. In Case No. F–75–178, the kidnapping of Paula Workman, the jury returned a verdict fixing the defendant's punishment at seventy (70) years imprisonment. Both sentences were in accordance with the provisions of 21 O.S.1971, § 51. The trial court pronounced judgments and sentences in accordance with the verdicts of the juries. From each of these judgments and sentences an appeal has been filed with this Court. Since the same assignments of error are raised in both appeals, we have consolidated them for consideration.

At the two trials the testimonies of the two victims, Kim Thomas, a 16-year-old at the time of the abduction, and Paula Work-

man, a 15-year-old at the time, were basically identical and are summarized below.

The two girls had gone to Miss Thomas' home at Route 1, McAlester, Oklahoma, on June 9, 1975. When Miss Thomas unlocked the door and pushed it open, co-defendant Parker "came out from behind the hall door and told me to stand still or he would shoot me." Upon hearing Miss Thomas' scream, Miss Workman ran around to the side of her house. Parker then put a gun to Miss Thomas' back and told her to tell Miss Workman to come back. Miss Workman returned and went back inside the house with Parker and Miss Thomas after Miss Thomas told her, "Paula come back or he'll blow your head off."

After the two girls were inside the house, Parker asked them if they had any money. The girls said they did not, and he told them, "You had better be telling the truth or I will kill you." Miss Thomas then gave Parker eight dollars. The defendant then held a weapon at Miss Thomas' back and forced her upstairs to get a picture of her parents. They returned downstairs and Parker forced Miss Workman, at gunpoint, to load Miss Thomas' car with a box containing items taken from the house. Miss Thomas identified the weapons used by the defendant and Parker as a ".12 gauge shotgun and a 30.06 deer rifle . . . stolen from my dad."

The two girls were forced to accompany the defendant and Parker in Miss Thomas' car, which she drove. Miss Thomas testified that the defendant and Parker told her, "If you take us back toward the prison, we won't hesitate to kill you." Miss Workman testified that while the group was driving to Muskogee the defendant and Parker warned them "that if a policeman or truck, you know with policeman or something was following us, that they would kill them if they had to."

Near Muskogee, the car was in need of gasoline and the defendant and Parker told Miss Thomas to get the gasoline while they hid near the road with Miss Workman. Parker warned Miss Thomas that if she ever wanted to see Miss Workman again she "had better go up there . . . get gas and . . . not call anybody." He warned her that if she did not return "within a certain period of time" he would kill Miss Workman. Miss Thomas testified that she followed the instruction.

The group then drove by back roads to Tulsa where they stopped to allow the girls to use the restroom. One girl at a time was allowed to go to the restroom while the other remained as hostage at gunpoint in the car.

While driving to Prague, the group stopped at a store where Parker bought a six-pack of beer. Miss Thomas testified that she and Miss Workman drank some of the beer because they were thirsty, and defendant and co-defendant Parker refused to buy anything else for them to drink. When they arrived in Prague defendant attempted to "hot wire" a car but came back to Miss Thomas' car, explaining that the other car was not a good one.

The group then drove to Meeker, apparently the defendant's hometown, where the car ran out of gasoline. The girls were forced at gunpoint to go with the defendant and Parker into a wooded area where there was a large barn-like building which housed machinery. Defendant then departed to look for another car to "hot-wire," but was spotted by a police officer and returned to where Parker was holding the girls.

Miss Thomas testified:

"[A] lot of—I guess county police or whatever they are started coming around, and they must—we ran up by this—a street, and then I guess they spotted us and we ran back down into the woods again.

"Q. You say you ran, were they forcing you to run?

"A. Yes, sir.

\* \* \* \* \* \*

"A. [T]hey said we had to cooperate or they would kill us." (Tr. 43, Case No. F–75–176)

Thereafter, the group remained hidden in the area throughout the night while a search involving local and State law enforcement officers was conducted using helicopters, spotlights and dogs. At one point, the defendant fired a shot at the lights, and later fired at the dogs.

In the morning the defendant and Parker sent Miss Workman out to the searchers with a demand that they be given a car full of gasoline, $200.00, and a "free-passageway" from the area with Miss Thomas. In Case No. F–75–176, Captain Ernest Allen of the Oklahoma Highway Patrol testified that he negotiated with the defendant on the demands, and testified that:

"[W]e had about three or four of these visits. I just went down and talked with him [defendant], . . . and I [would] go back and talk with the Chief Patrol and we couldn't meet their demands. In other words, we offered them the car and the money with the gas if they would release the girl unharmed. They refused to do this. . . .

\* \* \* \* \* \*

"I then learned that Johnson had a sister that lived in Meeker. We contacted her and I again went back to the wooded area with the purpose to see if she could talk him into coming out and not harming the girl. This didn't work either. He just—he just told us that if we didn't give him what he wanted, the money and the car and the gas, that he would kill the girl. He wouldn't listen to his sister either." (Tr. 50–51)

Trooper Gene Fitzpatrick of the Oklahoma Highway Patrol testified in Case No. F–75–178 that he had led the special team of troopers, eventually surrounding the defendant and Parker and forcing them to surrender. Miss Thomas was rescued unharmed.

In his two appeals, the defendant raises five assignments of error. Since the first three are not supported by any citations of authorities, we follow the rule this Court announced in *Collins v. State,* Okl.Cr., 407 P.2d 609, 610 (1965), which stated:

"*'It is necessary* for counsel for plaintiff in error not only to assert error, but *to support his contentions by both argument and the citation of authorities.* Where this is not done, and it is apparent that the defendant has been deprived of no fundamental rights, this court will not search the books for authorities to support the mere assertion that the trial court has erred.' *Fryar v. State,* Okl. Cr., 385 P.2d 818." (Emphasis added)

See, *Battle v. State,* Okl.Cr., 478 P.2d 1005, 1007 (1970); *Sandefur v. State,* Okl.Cr., 461 P.2d 954, 956 (1969). We note, however, that all of the first three assignments of error are without merit.

The first assignment of error is that the trial court erred in refusing to grant defendant's motion for a change of venue. Counsel argues, without citation of authority, "that it was at the time of trial impossible for him (defendant) to secure a fair trial in the jurisdiction due to the massive pretrial publicity, consisting of television as well as newspaper coverage; . . . publicity inundated this area and . . . potential jurors had been so inflammed by the publicity that it was impossible for the defendant to secure a trial from an unprejudiced and unbiased jury panel."

A careful reading of the record shows that the defendant failed to comply with the statutory requirements for a change of venue, as outlined in 22 O.S. 1971, § 561, which reads as follows:

"Any criminal cause pending in the district court may, at any time before the trial is begun, on the application of the defendant be removed from the county in which it is pending to some other county in said judicial district, *whenever it shall appear in the manner hereinafter provided* that the minds of the inhabitants of the county in which the cause is pending are so prejudiced against the defendant that a fair and impartial trial cannot be had therein. Such order of

removal may be made on the application of the defendant by petition, setting forth the facts, verified by affidavit, if reasonable notice of the application be given to the county attorney and the truth of all allegations in such petition be supported by the affidavits of at least three credible persons, who reside in said county. . . ." (Emphasis added)

Even if the defense had produced the required affidavits, this Court held as early as 1916, and consistently since, that the affidavits raise a question just as any other question of fact that might be submitted to the trial judge, and unless it is clear that he has abused his discretion, or committed error in his judgment, his finding and judgment will not be disturbed by this Court. *Wright v. State,* 12 Okl.Cr. 443, 444, 158 P. 290, 291 (1916). Accord, *Fry v. State,* 91 Okl.Cr. 326, 337, 218 P.2d 643, 650 (1950); and, *Rawls v. State,* 86 Okl. Cr. 119, 135, 190 P.2d 159, 164 (1948).

■ In the recent case of *Tomlinson v. State,* Okl.Cr., 554 P.2d 798 (1976), counsel raised the issue of prejudicial publicity in alleging error of the trial court which had refused a request, based on alleged prejudicial pretrial publicity, to sequester a jury. This Court said that media coverage of the crime or trial *might* be an argument for a change of venue, but added:

"[I]t is now settled that in all cases where jury prejudice is alleged *at any stage* of trial or appeal the burden of persuasion is on the defendant to show by clear and convincing evidence that (1) the jurors were specifically exposed to media reports which (2) were prejudicial to the defendant. . . ." (Emphasis added)

In *Fry v. State,* supra, at 650, this Court said:

". . . In *Sweet v. State,* 70 Okl.Cr. 443, 107 P.2d 817, 820 this court said in sustaining the trial court in a similar situation:

" 'The presumption of law is that a defendant can get a fair and impartial trial in the county in which the offense was committed; . . .' "

The principle announced by this Court in *Shapard v. State,* Okl.Cr., 437 P.2d 565, 578 (1967), quoting *United States v. Hoffa,* 156 F.Supp. 495 (D.C.1957), is applicable to this situation. There, the Court held that:

"Mere fact that there has been widespread adverse pretrial publicity about defendant does not, by itself, establish reasonable probability that defendant cannot obtain a fair and impartial jury at criminal trial . . .

\* \* \* \* \* \*

"Where there has been widespread adverse pretrial publicity about defendant, *proper procedure in vast majority of cases is . . . to proceed to trial and to determine on voir dire of panel and individual talesmen whether fair and impartial jury can be selected.*" (Emphasis added)

In the instant case, the defendant, who was acting as his own attorney as will be discussed *infra,* did not exercise his right to question prospective jurors on voir dire. However, the trial court did make a thorough examination of the jurors, regarding their knowledge of the case from whatever source, i.e., personal knowledge, newspaper stories, and television reports. It was the trial court's determination that the jury was not prejudiced and could reach a verdict based solely on the evidence. Nothing this Court has found in the record or in the defendant's brief negates the trial court's finding.

■ Defendant's second assignment of error is that the trial court erred in refusing to grant the defendant a separate trial from co-defendant Parker because it was "apparent and obvious to the participants in this trial that the defendant was in great fear of the defendant Parker, and was not free to exercise an independent will when in the presence of the defendant Parker."

In *Jones v. State,* Okl.Cr., 527 P.2d 169, 174 (1974), we said:

"[S]everence must be requested by defense counsel with counsel apprising the trial court of circumstances which may develop which might prejudice other co-defendants. Without such information *a judge cannot be presumed to know or can it be considered to appear that prejudice will result from the joinder. . . . defendant has the burden of presenting evidence in argument to the trial court to show how he would be prejudiced by the joinder of defendants. . . .*" (Citation omitted, Emphasis added)

In Ch*ance v. State,* Okl.Cr., 539 P.2d 412, 416, 417 (1975), we stated:

[*A*] *severance is not a matter of right on the part of defendant,* but rests entirely in the judgment of the trial court and a denial of a motion for severance will not be disturbed on appeal unless there is a clear showing of an abuse of discretion. See, *Wright v. State,* Okl. Cr., 505 P.2d 507 (1973)." (Emphasis added)

A careful examination of the record in the instant case shows that the defendant's counsel, before being released from the cases, petitioned the trial court for a severance from co-defendant Parker "inasmuch as their defenses are mutually incompatible and that if said defendants are tried together, such trial will result in a detriment and prejudice to their receiving a fair and impartial trial." There was no offering of evidence to support this claim before or during the trial, and no offering is made on this appeal.

We find this assignment of error to be without merit for the reasons cited in *Lemmon v. State,* Okl.Cr., 538 P.2d 596, 601 (1975):

". . . In their brief the defendants recite that they have been prejudiced but offer no specific examples of the same. We therefore hold that there was no error in overruling defendants' motion to sever."

██ The third assignment of error is that the trial court erred in refusing to sustain the defendant's motion to quash the amended information. Not only does this assignment lack citation to authority, but in support of it counsel presents no argument in its favor, other than to say, "It is appellant's contention that the information of the State did not conform to the laws as set out in the statutes of the State of Oklahoma."

The crime of Kidnapping is defined in 21 O.S.1971, § 741, which says, in pertinent part:

"Every person who, without lawful authority, forcibly seizes and confines another, or inveigles or kidnaps another, with intent, either:

"First. To cause such other person to be secretly confined or imprisoned in this State against his will; . . ."

The amended informations charge the defendant with the kidnappings of Kim Thomas and Paula Workman and set forth the required elements from the above cited statute. This assignment of error is utterly without merit.

In turning to the fourth and fifth assignments of error, we note that the facts as presented below make this a case of first impression in Oklahoma when they are considered in light of *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). Neither the State nor the defendant have cited the *Faretta* decision to this Court in their arguments, but we interpret that decision as applicable to the situation raised in the instant case.

Approximately ten days before the defendant and co-defendant Parker were to begin trial, they sent their court-appointed attorney, J. Leo Troy, Jr., a letter.[1] The

---

1. "Mr. Troy
"This is a short letter to inform you as of today 31 of October 75 Mr. Johnson, and I

(Danny Parker) feel, and know, we can not get your full concern, and representation, from you as a lawyer, why I don't know,

essence of that letter was that they thought Troy "had not been honest about certain things we have discussed" regarding the pending cases. They told Troy that they would not "be present in court with you as our attorney" and would "ask for different counsel."

On November 4, 1975, six days before the trial was to begin, the trial court held a hearing in chambers concerning the letter.[2]

and we are not saying this is disrespect to you. We will say that we will not be present in court with you as our attorney, you can show this to the courts, as we will bring it up at trial which we have a right to this (6th Amen.) Mr. Troy we have access to law books', and we have several friends' who know the law very well, and thing's we have discussed, you have not been honest about certain things, So for our benefit we no longer accept you as our attorney, and will ask for different counsel, we repeat we will not stand trial until another attorney is presenting our cases.

Danny Parker #88937
Lonnie C. Johnson #83185"

2. "THE COURT: Court is in session. These will be proceedings in F-75-176 and 178. The record may show that Danny Parker and Lonnie C. Johnson appear in open court. The state appears by Mr. Roberts; out of the hearing and presence of any prospective jurors summoned for the term of court now in progress.

"I will address my questions to both Mr. Parker and Mr. Johnson. I have been handed a letter, actually yesterday, written I am not sure by which one, but signed by both, is that correct?

"MR. PARKER: Yes, it is.

"MR. JOHNSON: Yes.

"THE COURT: The letter in effect says that you no longer wish the representation of Mr. Troy, who the record should as well show is present. Is that correct?

"MR. PARKER: Yes.

"MR. JOHNSON: Yes.

"THE COURT: The right to have an attorney to represent you is a personal right that each of you enjoy. If you are unable to employ one and you are a pauper, the public furnishes one to you at no cost, which has been done here. It is a right that can be waived. Are you telling me now that you do not desire the services of an attorney in this trial? These two trials?

"MR. PARKER: What you stated there. We want an attorney, but we want a different one, other than Mr. Troy.

"THE COURT: It is not the policy in the 18th Judicial District to allow paupers to pick the attorney that they are given for trial. We will not release Mr. Troy from further obligation and appoint another attorney to represent you. You have the right, as I pointed out to have an attorney. If you want an attorney to represent you, it will be Mr. Troy. If you choose to go on trial without Mr. Troy, you will not be represented by counsel. I would like to ask what your wishes are, I will give you your choice?

"MR. PARKER: We would like to have another attorney appointed.

"THE COURT: That I will not do. It will be Mr. Troy or no one.

"MR. PARKER: Then I don't guess there will be no one.

"THE COURT: Your name is?

"MR. PARKER: Danny Parker.

"THE COURT: Danny Parker. Mr. Johnson, is that you desire as well?

"MR. JOHNSON: Yes.

"THE COURT: You both desire to appear in court, according to the docket on the 10th of this month without an attorney?

"MR. PARKER: Well, we don't desire it, but that is the way it is going to be under these circumstances.

"THE COURT: All right. I will go this further step with you then. If you so desire, I will order Mr. Troy to sit at counsel table and advise you during the trial on such items that you think you need advice on.

"MR. PARKER: Well, if we can't have another attorney, then I don't guess we have any.

"THE COURT: We will not, less than a week prior to trial, release one attorney and appoint another. Actually we won't release one and appoint another at any stage, but certainly not less than a week before trial. Now these matters were set for trial next Monday, a week from yesterday, and we certainly can't change horses in the middle of the stream, and be ready for trial in six days on Kidnapping charges. I will at your choice either release Mr. Troy entirely, or instruct him to sit at counsel table with you and advise you during the trial. Which would you prefer that I do?

"MR. PARKER: Release him.

"THE COURT: Is that your thinking too Mr. Johnson?

"MR. JOHNSON: Yes.

"THE COURT: All right. It will be the order of the court that Mr. Leo Troy, Jr., is released at the request, acquiescence, and direction of both [defendants] from any further responsibility or liability in F-75-176 and F-75-178.

"Mr. Parker and Mr. Johnson, as I pointed out earlier, you have a right to act as your

The judge advised the defendant and Parker of their "personal right" under the Sixth Amendment to be represented by counsel, but warned them that if they persisted in their demand to fire Troy, he would do so and they would have to represent themselves during the trials. The defendant and Parker pressed their demand and Troy was released from the cases, but only after the defendant and Parker refused a further offer from the trial court to appoint Troy to sit at their table "and advise you during the trial on such items that you think you need advice on." [3]

The defendant and Parker subsequently refused to do more than sit in the courtroom during their trial for the kidnapping of Kim Thomas, Case No. F–75–176.[4] Parker refused to sit in the courtroom during the trial for the kidnapping of Paula Workman, Case No. F–75–178, and was held under guard in a nearby room. The

defendant attended the second trial and attempted to put on a defense.[5]

The fourth assignment of error is that the trial court should not have received a waiver of the assistance of counsel from the defendant. The fifth assignment of error is that "through his obvious ignorance and lack of education the ineptness of his (the defendant's) purported defense was tantamount to no defense or representation whatsoever."

In *Faretta v. California,* supra, 422 U.S. at 819–821, 95 S.Ct. at 2533–2534 Mr. Justice Stewart held:

"The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense. It is the accused, not counsel, who must be 'informed of the nature and cause of the accusation,' who must be 'confronted with the witnesses against him,' and who

---

own attorney, which in this case you will be. With the right to act as your own attorney, goes the responsibility to demean yourselves as attorneys and be bound by the same rules as a member of the bar would be. I will expect the same decorum from you as I will from any practicing member of the bar. Is there anything further that needs to be brought up?

"Court is in recess.

"I will order the clerk to file this letter. Gentlemen, it does not bear a date. The letter received by Mr. Troy yesterday, which would be—

"MR. PARKER: I believed I mailed that on the 31st.

"THE COURT: On the 31st? All right, the letter does not bear a date. This is what I had reference to. The letter, that it is stated in open court to have been mailed on the 31st, and I take it received on the 3rd?

"MR. TROY: That is correct, yes, sir.

"THE COURT: It is filed in this case in support of the motion apparently of the defendants to be allowed to represent themselves.

"Court is in recess." (Case No. F–75–176, pages 3–7)

3. See note 2, supra.

4. "THE COURT: The record will show in this matter that Danny Parker and Lonnie Johnson appear in person, having heretofore been afforded counsel, but at their request that counsel was discharged, and they appear in

this court at their request as their own attorney.

"What says the defendant, Danny Parker? Are you ready to proceed?

"MR. PARKER: Your Honor, no we are not. The other day, I don't think you understood what I said. Ah—Mr. Troy, I asked him to subpoena certain witnesses for me and Lonnie Johnson, and he wouldn't do it, and we have a right to witnesses on our behalf; and we are not going to have anything to do with this court. You all go ahead and do what you want. We are just going to sit here and listen. You all do what you want to. We do have a right to witnesses, and he wouldn't subpoena them. I asked him several times, and he made no attempt whatsoever. We don't have any kind of defense set up, and we will not have anything to do with this.

"THE COURT: What is the announcement of Lonnie Johnson?

"MR. JOHNSON: The same." (Case No. F–75–176, pages 3–4)

5. "MR. JOHNSON: I will sit in the courtroom, . . . but I still feel I need an attorney.

"THE COURT: I felt that you needed one and appointed you one. I think you made a mistake firing the attorney appointed for you. That was your decision.

"MR. JOHNSON: Yes, it was." (Case No. F–75–178, at page 4)

must be accorded 'compulsory process for obtaining witnesses in his favor.' Although not stated in the Amendment in so many words, the right to self-representation—to make one's own defense personally—is thus necessarily implied by the structure of the Amendment. The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails.

"The counsel provision supplements this design. It speaks of the 'assistance' of counsel, and an assistant, however expert, is still an assistant. The language and spirit of the Sixth Amendment contemplates that counsel, like the other defense tools guaranteed by the Amendment, shall be an aid to a willing defendant—not an organ of the State interposed between an unwilling defendant and his right to defend himself personally. To thrust counsel upon the accused, against his considered wish, thus violates the logic of the Amendment. In such a case, counsel is not an assistant, but a master; and the right to make a defense is stripped of personal character upon which the Amendment insists. It is true that when a defendant chooses to have a lawyer manage and present his case, law and tradition may allocate to the counsel the power to make binding decisions of trial strategy in many areas. . . . This allocation can only be justified, however, by the defendant's consent, at the outset, to accept counsel as his representative. An unwanted counsel 'represents' the defendant only through a tenuous and unacceptable legal fiction. *Unless the accused has acquiesced in such representation, the defense presented is not the defense guaranteed him by the Constitution, for, in a very real sense, it is not his defense.*" (Footnotes omitted, Citations omitted, Emphasis added)

In *Faretta v. California,* supra, 422 U.S. at 834–835, 95 S.Ct. at 2540–2541 the Court continued:

"It is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts. But *where the defendant will not voluntarily accept representation by counsel, the potential advantage of a lawyer's training and experience can be realized, if at all, only imperfectly.* To force a lawyer on a defendant can only lead him to believe that the law contrives against him. Moreover, it is not inconceivable that in some rare instances, the defendant might in fact present his case more effectively by conducting his own defense. Personal liberties are not rooted in the law of averages. The right to defend is personal. The defendant, and not his lawyer or the State, will bear the personal consequences of a conviction. It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage. *And although he may conduct his own defense ultimately to his own detriment, his choice must be honored* out of 'that respect for the individual which is the lifeblood of the law.' . . .

"When an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel. For this reason, in order to represent himself, the accused must 'knowingly and intelligently' forgo those relinquished benefits. *Johnson v. Zerbst,* 304 U.S. 458, 464–465, 58 S.Ct. 1019, 1023, 82 L. Ed. 1461, 146 ALR 357. Cf. *Von Moltke v. Gillies,* 332 U.S. 708, 723–724, 68 S.Ct. 316, 323, 92 L.Ed. 309, (plurality opinion of Black, J.). *Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes*

*open.' Adams v. United States ex rel. McCann,* 317 U.S. 269, 279, 63 S.Ct. 236, 242, 87 L.Ed. 268, 143 ALR 435." (Citations omitted, Emphasis added)

■ *Faretta* say that all defendants, including indigents, in criminal proceedings have a constitutional right, almost unlimited, to elect to proceed *pro se* provided the election is made in a voluntary, knowing and intelligent manner. This does not mean that an indigent defendant can demand a choice of appointed counsel. See, e. g., *Jones v. Johnson,* Okl.Cr., 404 P.2d 686 (1965). Once counsel has been appointed for an indigent, valid reasons for discharge and appointment of a new attorney include demonstrable prejudice against the defendant on the part of counsel, incompetence of counsel, and conflict of interest. See, e. g., *Day v. Page,* Okl.Cr., 436 P.2d 59 (1968). A personality conflict or disagreement over the conduct of the defense is not sufficient to allow a defendant to discharge his attorney, to permit this would allow him to delay his trial indefinitely by demanding a new attorney every time the trial is set. This Court views a demand for another counsel, based on the latter reasons, as nothing more than an impermissible delaying tactic.

■ The test whether a defendant has intelligently elected to proceed *pro se* is not the wisdom of the decision or its effect upon the expeditious administration of justice. It is only necessary that a defendant be made aware of the problems of self-representation so the record establishes that he understands that his actions in proceeding without counsel may be to his ultimate detriment. Under *Faretta v. California,* supra, the defendant's technical knowledge of the law and its operation at trial is totally irrelevant in the assessment of his knowing exercise of the right to defend himself.

■ For this Court to hold, as the defendant urges in his fourth assignment of error, that the trial court committed reversible error in discharging appointed counsel would require that we find his election was not voluntary, knowing and intelligent. A careful reading of the record results in a contrary conclusion.

In a hearing held before the two trials, but in conjunction with both of them, the trial court repeatedly warned that if the appointed counsel were released from the cases, another would not be appointed and the defendant would have to represent himself at trial. The defendant said his disagreement with the appointed counsel involved the calling of witnesses he wanted to testify in his behalf but whom counsel decided not to call.[6] Not only did the de-

---

6. During the first trial, the defendant offered the following explanation as jurors were being struck in chambers:

"MR. JOHNSON: Your Honor, like I said, we [defendant and co-defendant Parker] are not ready for this. We are on lockup and don't have access to law books. We don't know anything about this. I don't know why you all wouldn't appoint us another lawyer. I gave you a good enough reason why we didn't want Mr. Troy; and we need an attorney and I told you before that we didn't want to represent ourselves. We wanted an attorney, but we didn't want Mr. Troy. As I said, I needed witnesses. There is more to this then what has been brought out. He wouldn't subpoena my witnesses, and I said we don't want anything to do with this.

"THE COURT: We touched on that Friday and then again at the outset.
"MR. JOHNSON: Yes." (Case No. F–75–176, at pages 17–18)

Later, after the State rested its case, the following conversation took place in chambers:
"[THE COURT]: Mr. Parker, Mr. Johnson, the state has rested. You mentioned after the matter proceeded this morning that you did not have your witnessess here. The court will inquire of you, who did you intend to have as witnesses here?
"MR. PARKER: I was going to have my brother-in-law.
"THE COURT: And what is his name?
"MR. PARKER: James Edward White.
"THE COURT: White. Spell that last name for me.

fendant refuse to proceed to trial with the appointed counsel, he refused an offer by the trial court to have the counsel sit at the table with him during the trial to answer whatever legal questions the defendant might decide to ask of counsel.

The record establishes that the defendant knew the alternative to appointed counsel was self-representation. In addition, the defendant had twice been convicted of felonies, in 1965 for second-degree burglary and in 1971 for larceny of an au-

"MR. PARKER: White.
"THE COURT: W-H-I-T-E?
"MR. PARKER. Right.
"THE COURT: Where does Mr. White live?
"MR. PARKER: Ballenger, Texas.
"THE COURT: Ballenger, Texas. And who else?
"MR. PARKER: Claud Hendon.
"THE COURT: And where does Mr. Hendon live?
"MR. PARKER: Somewhere in Oklahoma City.
"THE COURT: Do you have an address on him?
"MR. PARKER: No, he used to work at the prison.
"THE COURT: Is that all?
"MR. PARKER: One young lady who works for the radio station in Oklahoma City. I don't have her name. I can't get it.
"THE COURT: And what radio station does she work for?
"MR. PARKER: I am not for sure.
"THE COURT: All right, who else.
"MR. PARKER: Al Schons.
"THE COURT: Where is Mr. Schons?
"MR. PARKER: I don't know. I just knew him out at the prison.
"THE COURT: Is he an employee at the prison?
"MR. PARKER: He was.
"THE COURT: All right, that is the fourth witness. Who else?
"MR. PARKER: County Clerk of Kingfisher, Gladys Rivers.
"THE COURT: Gladys—
"MR. PARKER: Rivers.
"THE COURT: All right.
"MR. PARKER: I believe that is it?
"THE COURT: All right, now then. The same witnesses?
"MR. JOHNSON: The same witnesses.
"THE COURT: All right, let me ask. James Edwards White from Ballenger, Texas. What would have been the substance of his testimony?
"MR. PARKER: I would rather not discuss it.
"THE COURT: Well, I am attempting to see— to insure that you have had a fair trial. I cannot determine without knowing the materiality, the substance of his testimony, if it would have been even competent or not.

"MR. PARKER: Like I said, Mr. Troy knows why I wanted these people. I don't know why he wouldn't have subpoenaed them. All of these have a great deal to do with it.
"THE COURT: All right, Mr. Claud Hendon, the former OSP guard, somewhere in Oklahoma City. What would have been the substance of his testimony? What did you intend to—
"MR. PARKER: I don't want to bring all of this out. This should have been done before we ever come to trial. I think it is a little late now.
"THE COURT: I agree with you, it is quite a bit too late, but I wanted to make sure that your rights are protected. Now the unknown lady, and unknown radio station?
"MR. PARKER: Her brother is over in prison. I would have to get her name from him, but I can't get it.
"THE COURT: Would you disclose to me what you intend to prove by her testimony?
"MR. PARKER: Like I said, I don't want to bring any of this out.
"THE COURT: The same thing as Mr. Al Schon?
"MR. PARKER: Yes.
"THE COURT: The same thing as to the County Clerk of Kingfisher County?
"MR. PARKER: Yes.
"THE COURT: You prefer not to tell me what you intend to prove by these people?
"MR. PARKER: Like I said, I—
"THE COURT: All right, as to the other defendant, is this your feeling as well? You prefer not to tell me what you intend to prove by these witnesses, what the substance of their testimony would be?
"Do you have any witnesses here to proceed at trial at this time? The state has rested. Now is the time that you would call any witnesses that you have. Do you have any that you want to call?
"MR. PARKER: Like I said, we don't have a lawyer, we don't—
"THE COURT: I am sure that I appreciate that. You asked me to fire your lawyer, which I did one day last week.
"MR. PARKER: That is correct.
"THE COURT: Do you have any witnesses that you intend to call at this time here?
"MR. PARKER: No, we don't." (Case No. F-75-176, at pages 53-57)

tomobile. He cannot be considered ignorant of the task he faced in representing himself. All that is required for an effective election for self-representation is that the defendant have full knowledge or adequate warning concerning this right and a clear intent to exercise it. Cf., e. g., *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461, 146 A.L.R. 357 (1938). In *Conroy v. United States,* 296 F.Supp. 693, 695 (N.D.Okl.1969), the Federal Court for the Northern Disrict of Oklahoma stated:

". . . The attorney appointed for the Petitioner was a competent criminal attorney and was representing the Petitioner in a proper and capable fashion. The Court refused to remove the attorney from the cases. The *Petitioner's right to counsel does not carry with it the right to select a particular lawyer as his court-appointed attorney.* . . ." (Citations omitted, Emphasis added)

No cause whatsoever was shown by the defendant at trial for the removal and replacement of Mr. Troy as counsel. In *United States v. Burkeen,* 355 F.2d 241, 245 (6th Cir. 1966), the Court stated:

"[Defendant's] right to counsel does not carry with it the right to select a particular lawyer as his court-appointed attorney. . . . Nor was the district court required to set aside the prior appointment of counsel and appoint new counsel for [defendant] in the absence of a showing of good cause. . . . "Further, [defendant] *had the right to represent himself and to insist upon the discharge of his court-appointed counsel.* . . . The constitution does not 're-

quire that under all circumstances counsel be forced upon a defendant.' . . . (Citations omitted, Emphasis added)

We find that the defendant elected to proceed *pro se* when he persisted in his demand that his appointed counsel be replaced without offering an adequate explanation for the demand. That he subsequently refused to take part in his trial for the kidnapping of Kim Thomas, Case No. F–75–176, other than repeatedly to demand the appointment of a different counsel, does not vitiate this election.

As to the second trial for the kidnapping of Paula Workman, Case No. F–75–178, conducted three days later, we find there was a continuing election for self-representation which did not require the trial court to offer reappointment of counsel for the defendant.[7] The defendant's attempt to conduct a defense in the second trial, inadequate though it was when compared to professional standards and despite the generous help given to the defendant by the trial court, shows that he still considered his election in effect. Nor can this Court ignore that after the two trials were completed, the defendant sent a letter[8] to the counsel originally appointed requesting that the attorney contact the trial court and seek reappointment as counsel to represent the defendant on this appeal. The trial court granted the defendant's requests. If the counsel is acceptable for appeal, he is acceptable for trial. The defendant could have requested the reappointment of counsel for the second trial, but he did not. He continued, instead, to exercise his constitutional right of self-representation.

---

7. See, note 5, supra.

8. "Dear Mr. Troy,
 "I'm sorry for giving you so much trouble. But talk to Judge Martin [the trial judge] and see if he will appoint you as my laywer (sic) to represent me on my appeal on these two kidnapping charges.
 "I know mr. troy I was wrong now and I sure hope and pray that Judge Martin will appoint you (sic) for me? because I was wrong. and I sure need your help too?

mr. troy will you help me if mr. Martin appoints you to represent me as my laywer (sic) on this appeal. I will sure appreciate it if you will be my laywer (sic) and represent me now? I know it is alot (sic) of trouble, but I sure need a laywer (sic) now. will you help me. thank you very much
"Thank you for your time and consideration
"yours truly
"Lonnie C. Johnson
"83185

In applying the *Faretta* decision to this case, we are compelled to admonish, as we did in *Stiner v. State,* Okl.Cr., 539 P.2d 750, 753 (1975), that when dealing with defendants asserting their right to self-representation:

"[T]he trial courts of [Oklahoma] should proceed with caution. Since the right to proceed without an attorney or by counsel necessarily involves conflicting interests, the trial court should clearly ascertain that a defendant knowingly, voluntarily and intelligently elects to proceed pro se, and in an appropriate case attention should be given to the following passage from [*Faretta*]."

" ' . . . [A] State may—even over objection by the accused—appoint a "standby counsel" to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary. . . . ' " (422 U.S. at 834, n. 46, 95 S.Ct. at 2541, n. 46)

This Court *strongly encourages* trial courts in this jurisdiction to appoint standby counsel in cases where the defendant elects to represent himself. It is not difficult to envision situations where a defendant—either acting in good faith but handicapped by ignorance of the law, or through preplanned design—causes a mistrial or creates reversible error. The right to self-representation is not absolute but is subject to restrictions and may be lost. Mr. Justice Stewart sets the limits of self-representation in another section of footnote number 46 in *Faretta,* supra, 422 U.S. at 834, 95 S.Ct. at 2541, as follows:

"[T]he trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct. . . ." (Citations omitted)

If termination becomes necessary or if the defendant changes his mind and decides during the trial that he wants to be represented by counsel, a standby counsel would be able to step in and the trial could continue regardless of whether the defendant forfeits or relinquishes his right of self-representation.

In disposing of the fifth assignment of error, we again quote from footnote number 46 in *Faretta v. California,* supra, 422 U.S. at 384, 95 S.Ct. at 2541:

"[W]hatever else may or may not be open to him on appeal, a defendant who elects to represent himself *cannot thereafter complain that the quality of his defense amounted to a denial of 'effective assistance of counsel.'*" (Emphasis added)

For all the above and foregoing reasons, the judgments and sentences appealed from are, accordingly, *AFFIRMED.*

BRETT, P. J., concurs in results.

BUSSEY, J., concurs.

BRETT, Presiding Judge (concurring in results).

I concur in the results reached in this decision. The trial judge did almost everything he could to assure that the defendant had legal representation, but the defendant declined to accept the attorney appointed for him. I believe in these situations that the trial judge should insist, notwithstanding the defendant's right to properly waive counsel, that a standby counsel be appointed to advise the defendant. This should be done whether or not the defendant takes advantage of the assistance made available to him. The situation in this case was somewhat different to that found in *Faretta v. California,* supra; therefore, it is not specifically applicable herein. However, the principle laid down in *Faretta* is noteworthy subject to a full record inquiry and disclosure by the trial court and the defendant. It is not enough for the defendant to merely state that he desires to proceed as his own attorney. In *Cothrum v. State,* Okl.Cr., 503 P.2d 1298 (1972), Cothrum was permitted to proceed as his own

attorney, but he accepted the standby counsel for assistance. It has always been the general rule in Oklahoma that standards higher than what is required by the federal courts are required for our trial courts, and I can see no reason to vary from that general requirement in these types of cases. Otherwise, I concur in the results reached in this decision.