LEWIS, Vice Presiding Judge:
 

 ¶ 1 Appellant, Fabion Demargio Brown
 
 [1]
 
 , was charged conjointly with Brodric Lontae Glover and Emily Ann Matheson with two counts of first degree murder in violation of 21 O.S.2011, § 701.7, and one count of conspiracy to commit murder in violation of 21 O.S.2011, § 421, in the District Court of Oklahoma County, Case No. CF-2012-938.
 
 [2]
 
 The State filed a Bill of Particulars alleging two aggravating circumstances: (1) the defendant knowingly created a great risk of death to more than one person; and (2) the defendant committed the murder for remuneration or the promise of remuneration or employed another to commit the murder for remuneration or the promise of remuneration. 21 O.S.2011, § 701.12 (2) and (3).
 

 ¶ 2 Fabion's case was severed from his codefendants, and his trial commenced on June 16, 2014, before the Honorable Ray C. Elliott, District Judge. The jury found Fabion guilty on all counts and assessed punishment at death on the two first degree murder convictions, after finding the existence of both of the aggravating circumstances. The jury assessed ten (10) years imprisonment and a $5,000 fine on the conspiracy count. Judge Elliott formally sentenced Fabion in accordance with the jury verdict on August 11, 2014. Thereafter, Fabion perfected his appeal to this Court.
 
 [3]
 

 I. FACTS
 

 ¶ 3 Fabion was the estranged husband of the victim, Jessica Brown. They were in the process of divorcing, and Fabion owed child support for their two children. The Browns' marital problems began sometime in 2009, and Jessica Brown told family and friends that she was afraid of her husband. Ms. Brown filed for divorce in April 2011, and she received temporary custody of the children. Fabion's child visitation was limited by court order but he wanted custody of their two children or, at least, expanded visitation.
 

 ¶ 4 During the summer of 2011, Ms. Brown became pregnant with a third child. She expressed plans to move back, with her children, to her home State of Washington to be near her family. Fabion told friends and acquaintances that he did not want Jessica to take the children away to Washington. Emily Matheson testified that Fabion discussed his options, including the killing of his wife, to get her out of the picture.
 

 ¶ 5 On the morning of January 11, 2012, officers of the Midwest City Police Department responded to a call reporting that two children, ages six and three, were in the street in front of Jessica Brown's home. Officers arrived and noticed that the front door of the home was open. Upon checking the home, officers found Jessica Brown lying lifeless at the foot of her bed. She had been shot in the head.
 

 ¶ 6 On that same day, Fabion appeared at the Oklahoma County courthouse for a hearing on his child support. He had told Matheson that he thought he would go to jail for not paying support. While he was at the courthouse, he was told that Jessica was found dead at her house.
 

 ¶ 7 Matheson testified against Fabion. She met Fabion in October 2011. They moved into an apartment together shortly thereafter. After they moved in together, Fabion began discussing the prospect of murdering Jessica. Fabion was employed at Club ATL as a disc jockey. Matheson spent quite a bit of time at the club. They met Brodric Glover at the club. Glover was employed to clean the club after it closed. Glover was included in the discussions about killing Jessica.
 

 ¶ 8 A plan was conceived whereby Glover would be paid $250 dollars for killing Jessica. Fabion wanted Glover to kill Jessica during the night while she was at home. Fabion told Glover how to get into the house and told him he could not use a .40 caliber weapon, as Fabion had once owned a .40 caliber weapon.
 

 ¶ 9 Matheson testified that the three of them drove by Jessica's house during the first week of January 2012. Fabion said that he wanted Jessica killed before his January 11 child support hearing.
 

 ¶ 10 On January 9, 2012, Fabion leased a Kia Soul, for one day, from a rental company located at the Sears store in Quail Springs Mall. Fabion took out a payday loan that day, met Glover, gave him $125, and gave him the Kia Soul. Fabion and Matheson went to a casino that night and rented a room. About midnight, Glover called and said the killing would not take place that night.
 

 ¶ 11 The next day, January 10, Fabion extended the lease of the Kia for an additional day. That evening, Fabion asked Jessica Eckiwaudah to spend the night and hang out. She agreed. Fabion, Matheson and Eckiwaudah played video games until about midnight. The three then turned in for the night. Eckiwaudah went to sleep on the couch.
 

 ¶ 12 At about 3:00 a.m. that night, Glover called Matheson and told her that the killing was done. She relayed the information to Fabion. Fabion gave her $125, and she drove Fabion's pickup to the Belle Isle Wal-Mart to meet Glover and pay him the $125. Eckiwaudah saw Matheson leave the apartment.
 

 ¶ 13 Glover was at the Wal-Mart in the Kia Soul with two other individuals. After meeting with Glover, Matheson returned to the apartment.
 

 ¶ 14 The investigation revealed that Jessica Brown died from two nine millimeter caliber gunshot wounds to the head. Jessica Brown's unborn child was viable at the time of her death, as her pregnancy was 24 weeks and two days along. The authorities utilized video surveillance tapes, wire-taps, cell phone usage data, and interviews before arresting Matheson, Fabion and Glover. Matheson was the first to be arrested. During her first contact with police, she denied any involvement, but later confessed to the murder plot. Glover did not testify.
 

 II. ISSUES RELATED TO WAIVER OF COUNSEL AND
 
 PRO SE
 
 REPRESENTATION
 

 ¶ 15 In proposition one Fabion claims that the waiver of his right to counsel was not voluntary, knowing or intelligent. A defendant's right to waive representation by counsel and proceed
 
 pro se
 
 is found in the Sixth Amendment to the United States Constitution.
 
 [4]
 

 Faretta v. California
 
 ,
 
 422 U.S. 806
 
 , 818-21,
 
 95 S.Ct. 2525
 
 , 2532-34,
 
 45 L.Ed.2d 562
 
 (1975). A waiver of the right to counsel is voluntary, knowing and intelligent when a defendant is informed of the dangers, disadvantages, and pitfalls of self-representation.
 
 Faretta
 
 ,
 
 422 U.S. at 835
 
 ,
 
 95 S.Ct. at
 
 2541 ;
 
 Mathis v. State
 
 ,
 
 2012 OK CR 1
 
 , ¶ 7,
 
 271 P.3d 67
 
 , 71-72.
 
 [5]
 
 These dangers "must be 'rigorous[ly
 ]' conveyed."
 
 Iowa v. Tovar
 
 ,
 
 541 U.S. 77
 
 , 89,
 
 124 S.Ct. 1379
 
 , 1388,
 
 158 L.Ed.2d 209
 
 (2004).
 

 ¶ 16 In determining whether a defendant has intelligently elected to proceed
 
 pro se,
 
 the question is not the wisdom of the decision or its effect upon the expeditious administration of justice.
 

 [A]n "intelligent" decision to waive counsel and proceed
 
 pro se
 
 is not the same as a "smart" or well-thought decision. The issue is whether the defendant was adequately informed and aware of the significance of what he was giving up, by waiving the right to be represented by counsel.
 

 Mathis v. State
 
 ,
 
 2012 OK CR 1
 
 , ¶ 8,
 
 271 P.3d 67
 
 , 72. Even when a defendant exhibits an unrealistic or foolish view of his case and possible defenses, he may still be granted the right to choose self-representation.
 
 Maynard v. Boone
 
 ,
 
 468 F.3d 665
 
 , 678 (10th Cir. 2006). It is only necessary that a defendant be made aware of the problems of self-representation so the record establishes that he understands that his actions in proceeding without counsel may be to his ultimate detriment.
 
 Id
 
 . at 678-79.
 

 ¶ 17 Fabion claims that he was forced to choose between either unprepared, ineffective counsel, or waive counsel and represent himself. Undoubtedly, a defendant who faces a choice between incompetent or unprepared counsel and appearing
 
 pro se
 
 faces a constitutional dilemma.
 
 United States v. Padilla
 
 ,
 
 819 F.2d 952
 
 , 955 (10th Cir.1987).
 

 ¶ 18 Fabion cites several instances where he complained about counsel before he decided to ask the trial court to allow him to represent himself. His complaints centered on a lack of communication and the inability to assert a speedy trial right. He voiced complaints about access to discovery materials, claimed counsel was misinforming him about significant legal issues, and improperly coercing him into taking a plea deal. Fabion continuously sent letters to the trial court complaining about his appointed counsel. Finally, in a letter dated March 10, 2014, Fabion requested that he be allowed to represent himself.
 

 ¶ 19 On March 13, 2014, the trial court conducted a hearing on Fabion's request pursuant to
 
 Faretta
 
 . As part of that hearing, the trial court specifically inquired whether or not Fabion was requesting to represent himself because counsel was constitutionally ineffective. A defendant's complaints about counsel must rise to the level of ineffectiveness that would allow a defendant to assert a right to new counsel.
 
 Padilla
 
 ,
 
 819 F.2d at 955
 
 .
 

 ¶ 20 This Court has recognized valid reasons for discharge of an appointed counsel and appointment of new counsel; they include demonstrable prejudice against the defendant, incompetence, and conflict of interest.
 
 Johnson v. State
 
 ,
 
 1976 OK CR 292
 
 , ¶ 33,
 
 556 P.2d 1285
 
 , 1294. Neither a personality conflict nor disagreements over the conduct of the defense constitute valid reasons.
 

 Id.
 

 ¶ 21 Fabion's complaints were revealed during the
 
 Faretta
 
 hearing. The trial court was very careful in its inquiry about Fabion's dissatisfaction with appointed counsel.
 
 See
 

 United States v. Silkwood
 
 ,
 
 893 F.2d 245
 
 , 248 (10th Cir. 1989). Indeed,
 
 Silkwood
 
 held that a trial court must, in order for a waiver of counsel to be deemed voluntary, delve into reasons why a defendant is dissatisfied with counsel and wants to proceed with self-representation.
 

 Id.
 

 This requirement ensures that a defendant is not exercising "a choice between incompetent or unprepared counsel and appearing
 
 pro se
 
 ."
 
 Id
 
 .
 

 ¶ 22 Fabian's complaints, however, did not rise to the level that would have allowed him the appointment of a new attorney. His complaints were mere personality conflicts and disagreements. Fabion again complained that his attorney tried to convince him to enter a plea instead of risking the death penalty. He argued that counsel, in his words, "insinuated" that he could not get a fair trial because of his biracial marriage.
 

 ¶ 23 Counsel responded and told the court that she as well as other attorneys involved in the case explained to him about the expected racial makeup of the jury. Counsel indicated that there was some evidence (in
 the form of text messages) that Fabion knew, well in advance of meeting with his attorneys, that trial would be difficult because of the difference in race between him and his wife. These conversations, in the worst case scenario, are things that experienced trial counsel would point out to a client, so a client could make informed decisions.
 

 ¶ 24 Fabion was allowed to further specify his dissatisfaction. He stated that he believed his attorney wasn't totally honest, as he had asked his attorney certain questions and she would give an answer, but he would research and find cases supporting a contradictory answer. He claimed he even found a case where his attorney was involved and when he asked his attorney about it, he got no response. Fabion then generally complained that there was a lack of communication, because he didn't always get responses to his letters, and sometimes he did not "get a clear answer." He complained he didn't get explanations about the contradictory research. He stated that he was "having issues getting those why's ...." He summed up his complaint by saying that he didn't trust that he was getting "her best and I think I can do it better myself."
 

 ¶ 25 Fabion expressed no dissatisfaction with co-counsel who was new to the case. Fabion's explanation was that he believed it would be a lot better for him if he went ahead and did it himself. Judge Elliott made the finding that Fabion was "not dissatisfied with [counsel] ... because of their incompetence or their unpreparedness."
 

 ¶ 26 The record supports the trial court's decision and indicates that Fabion was not forced between the choice of accepting ineffective, incompetent counsel and the choice of representing himself; thus, his choice was not improperly coerced. On appeal, Fabion has not set forth any basis for the belief that his appointed attorneys were not providing adequate legal assistance.
 

 ¶ 27 Once the trial court determined that Fabion's decision of self-representation was not based on a valid belief that his appointed attorneys were constitutionally ineffective, the trial court proceeded to warn Fabion about the dangers of self-representation. The trial court pointed out to Fabion that, in his request to act as his own attorney, he admitted he didn't know what he was doing. Fabion explained that he meant that he was not familiar with the court rules and procedures. He claimed he could present the facts "easily," because he knew "the facts better than anyone else that would be present. And therefore, I would have an advantage in that area."
 

 ¶ 28 Judge Elliott acknowledged that he might know more about the facts, but he would also be required to know the law and the rules and procedures of the district court. Judge Elliott explained that his own bench book had taken him twenty-five years to compile, and Fabion would be expected to know the applicable rules, procedures and laws, whether based on cases, statutes or rules.
 

 ¶ 29 Judge Elliott told Fabion that he would be expected to know as much as his appointed attorneys who were among the "most experienced death penalty litigators in this State." He noted that part of their job is to "save your life" in a death penalty case. He explained that it is the attorney's job to examine the evidence and the law and make recommendations to their clients based on the law, the evidence, and their combined experience. Judge Elliott warned Fabion against listening to legal advice from others sitting in the jail or others out on the street. He also explained that if he was "not guilty" his attorneys would want a result that reflects that truth, even though their primary objective is to "save your life." Judge Elliott then explained the real possibility of the death penalty being carried out in Oklahoma.
 

 ¶ 30 During the hearing, Judge Elliott warned Fabion several times that the trial court was limited on giving Fabion advice on rules and regulations such as issuing subpoenas, admitting evidence, and conducting
 
 voir dire
 
 . He explained that the decision for Fabion to represent himself was Fabion's alone, and his decision to accept a plea deal was also his decision and no one could make him "sign for anything."
 

 ¶ 31 Judge Elliott warned Fabion that his chances of getting a fair trial were less likely if he represented himself, because he would
 not "understand the nuances of trying a death penalty case." He opined that the "stakes are too high" for self-representation in a death penalty case. Judge Elliott emphasized the fact that this could be a life or death decision.
 

 ¶ 32 Judge Elliott next informed Fabion, as required by
 
 Patterson v. Illinois
 
 ,
 
 487 U.S. 285
 
 ,
 
 108 S.Ct. 2389
 
 ,
 
 101 L.Ed.2d 261
 
 (1988), of the pitfalls of representing himself, some of which he had already covered. Judge Elliott again explained that he would be bound by the same rules as his attorneys; he would have to voice objections in the same form as attorneys do, and have a legal basis for the objection. Fabion would have to follow courtroom procedures and local court rules, and he would have to conduct himself in the same manner required of attorneys. Judge Elliott explained that Fabion would get no preferential treatment due to his lack of experience and training. Judge Elliott also explained, that in his experience, a jury would not "cut [Fabion] ... any slack" because he was representing himself. Judge Elliott again reminded Fabion that he, as the Judge, could not tell him or advise him on the proper way to conduct a trial.
 

 ¶ 33 Judge Elliott noted that Fabion seemed very confident, but warned that his reasonableness could be blinded by his confidence. Judge Elliott also noted that, unlike many defendants, Fabion seemed very articulate, but being articulate does not mean that he would be well versed in the law or in the procedures that he would be bound by. The record indicates that Fabion was twenty-four years old when he was charged. Fabion had already revealed that he was able to research legal matters by filing many
 
 pro se
 
 documents. The trial court finally advised that Fabion would be responsible for unfavorable rulings when Fabion did not follow the proper procedures.
 

 ¶ 34 One of Fabion's attorneys spoke up and reminded Fabion, and the trial court, that, to preserve the record on appeal, a remedy must be suggested. He was concerned that Fabion would not properly preserve a record for appeal. Judge Elliott added that Fabion risked the chance of error being waived on appeal because he did not preserve issues during trial. Judge Elliott explained that even the best trained lawyers make mistakes, so just imagine the mistakes he might make as someone untrained in the law. Even after these weighty warnings, Fabion acknowledged that he understood the pitfalls and still wanted to represent himself.
 

 ¶ 35 Judge Elliott continued to question Fabion to determine whether he was making a knowing decision. He asked Fabion if anyone was encouraging him to represent himself, and Fabion indicated that no one was encouraging him to represent himself. To the contrary, Fabion indicated that his appointed attorneys warned him to be certain before he "step[ped] off the dock." Fabion assured the trial court that he was making this decision of his own free will, that he had not been forced or threatened to make this decision, and no one had made him any promises in exchange for his decision.
 

 ¶ 36 Finally, Judge Elliott warned Fabion that if he engaged in misconduct, obstructionism, or disruption of the proceedings, he was authorized to terminate Fabion's self-representation, and Fabion indicated that he understood.
 

 ¶ 37 Throughout the proceeding, Judge Elliott emphasized the serious nature of the death penalty. He informed Fabion, that if found guilty of the crimes, the lowest sentence he could get would be eighty-five percent on a life sentence, "38-plus years."
 

 ¶ 38 Judge Elliott found that Fabion was articulate, confident and no doubt competent enough to undertake the decision to represent himself. Judge Elliott expressed no doubt that Fabion understood everything he had explained to him. Judge Elliott, therefore, granted Fabion's motion to represent himself.
 

 ¶ 39 The record is abundantly clear that the trial court advised Fabion of the dangers (that he was not well versed in the law and procedure) and the pitfalls of self-representation as required by
 
 Faretta
 
 .
 
 See
 

 Braun v. State
 
 ,
 
 1995 OK CR 42
 
 , ¶¶ 13-14,
 
 909 P.2d 783
 
 , 788-89. Whether a valid waiver of counsel exists is determined from a totality of the circumstances including the individual facts of the case and the experience and
 conduct of the defendant.
 
 Id
 
 . ¶ 12,
 
 909 P.2d at 788
 
 .
 

 ¶ 40 The third part of this claim (subpart C) is the argument that the record does not support the finding that Fabion's choice to choose self-representation was intelligently made. He argues that the trial court, first, did not fully explain the order of trial, specifically the nature of a penalty phase in a death-penalty trial; second, did not explain and clarify the role of standby counsel and inconsistently made pronouncements regarding standby counsel's duties; third, misinformed Fabion about his ability to subpoena witnesses; and fourth, failed to inform Fabion that his ability to conduct legal research and view discovery would be diminished if he waived his right to an attorney. These complaints are not borne out in the record.
 

 ¶ 41 It seems that Fabion's argument under the first part of the proposition is that his waiver could not be knowing and intelligent because he did not possess the intelligence of an attorney who is familiar with the trial procedure and rules. His general argument is the failure to explain the order of trial, especially the second stage.
 

 ¶ 42 Whether or not Fabion received training from the trial court is a non-issue, as a trial court is under no obligation to train a
 
 pro se
 
 defendant on trial procedure. Fabion has no "constitutional right to receive personal instruction from the trial judge on courtroom procedure."
 
 McKaskle v. Wiggins
 
 ,
 
 465 U.S. 168
 
 , 183,
 
 104 S.Ct. 944
 
 , 954,
 
 79 L.Ed.2d 122
 
 (1984). The 10th Circuit Court of Appeals has held that a developed and complete understanding of courtroom procedure is unnecessary, if the record shows that the defendant was aware "of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter."
 
 Silkwood
 
 ,
 
 893 F.2d at 248
 
 ,
 
 quoting
 

 Padilla
 
 ,
 
 819 F.2d at 956-57
 
 . A defendant's technical legal knowledge is totally irrelevant in the assessment of his knowing exercise of the right to represent himself.
 
 Faretta
 
 ,
 
 422 U.S. at 836
 
 ,
 
 95 S.Ct. at
 
 2541 ;
 
 Johnson
 
 ,
 
 1976 OK CR 292
 
 , ¶ 34,
 
 556 P.2d at 1294
 
 .
 

 ¶ 43 Judge Elliott's explanations and warnings were obviously sufficient for the first stage of trial where the jury would only be expected to determine Fabion's guilt or innocence. The warnings, however, were woefully insufficient to give Fabion the information to make a knowing and intelligent waiver of counsel for the punishment stage of a capital trial. The trial court's explanations were insufficient to explain the circumstances in mitigation of punishment. Clearly, the punishment stage of a capital trial involves the presentation of mitigating evidence or the knowing and voluntary waiver of the presentation of that evidence.
 

 ¶ 44 While a trial court is not required to explain, in detail, the second stage procedure, this Court's jurisprudence requires that a defendant have some understanding of mitigating evidence before he waives the presentation of that evidence.
 
 See
 

 Wallace v. State
 
 ,
 
 1995 OK CR 19
 
 , ¶ 21,
 
 893 P.2d 504
 
 , 512-13. The second stage of a death penalty case is unique among trials in Oklahoma. The second stage is the means by which the State is obligated to present evidence to support the alleged aggravating circumstances beyond a reasonable doubt, and a defendant is allowed to present mitigating evidence which might persuade a jury to recommend a sentence less than death.
 

 ¶ 45 A defendant is not required to present mitigating evidence.
 
 Wallace
 
 , ¶ 18,
 
 893 P.2d at 511
 
 . A defendant must, however, be given the opportunity to present mitigating evidence.
 
 Id
 
 ."[M]itigating evidence is critical to the sentencer in a capital case."
 
 Wallace
 
 , ¶ 12,
 
 893 P.2d at 510
 
 .
 

 ¶ 46 To support his overarching complaint under this area of his brief regarding trial procedure and his complaint about the lack of instruction about the second stage, Fabion cites
 
 Lay v. State
 
 ,
 
 2008 OK CR 7
 
 , ¶ 11, fn 9,
 
 179 P.3d 615
 
 , 620, fn 9, arguing that the trial court did not explain in detail "how the penalty phase of a trial works." In
 
 Lay
 
 , the footnote states that,
 

 Here we find Lay's waiver of counsel was adequate. In a death penalty case the trial
 court must explain in detail to any defendant desiring
 
 pro se
 
 representation how the penalty phase of a capital trial works.
 

 ¶ 47 The language in this footnote was not necessary to the holding in the
 
 Lay
 
 case, thus it is
 
 dicta
 
 .
 
 See
 

 Wainwright v. Witt
 
 ,
 
 469 U.S. 412
 
 , 422,
 
 105 S.Ct. 844
 
 , 851,
 
 83 L.Ed.2d 841
 
 (1985) (holding statements in a footnote were
 
 dicta
 
 because they were unnecessary to decide a case).
 
 Wainwright
 
 does not hold that all statements in footnotes are
 
 dicta
 
 as the State argues; however, here the footnote is clearly
 
 dicta
 
 .
 
 Dicta
 
 , or more precisely
 
 obiter dictum
 
 , are words of an opinion which are entirely unnecessary for the decision of the case, and, therefore, not precedential. Black's Law Dictionary (10th ed. 2014). In other words
 
 dicta
 
 "is an expression in a court's opinion which goes beyond the facts before the court and therefore is an individual view of the author and is not binding in subsequent cases."
 
 See
 

 Cohee v. State
 
 ,
 
 1997 OK CR 30
 
 , ¶ 4,
 
 942 P.2d 211
 
 , 219 (Lane, J. concurring in results) (citing Black's Law Dictionary, 5th ed. 408, 409).
 

 ¶ 48 Even though the footnote in
 
 Lay
 
 was
 
 dicta
 
 , our decision in
 
 Wallace
 
 [supra] holds that a defendant should know and understand the rights he is abandoning during a sentencing stage of a capital case.
 
 Wallace
 
 sets forth a framework that can be utilized when a defendant chooses self-representation in a capital case.
 
 Wallace
 
 , ¶ 21,
 
 893 P.2d at 512-13
 
 . As that framework applies in these types of cases, the trial court must ensure that a defendant choosing self-representation understands his rights, not only in the guilt/innocence process, but also in the sentencing process. In doing so,
 

 1) the trial court must inform the defendant of the right to present mitigating evidence and what mitigating evidence is;
 

 2) the trial court must inquire of the defendant whether he or she understands the sentencing rights;
 

 3) the trial court must inquire of the defendant and make a determination on the record whether the defendant understands the importance of mitigating evidence in a capital sentencing scheme, understands such evidence could be used to offset the aggravating circumstances proven by the prosecution in support of the death penalty, and the effect of failing to present that evidence;
 

 4) after being assured the defendant understands these concepts, the court must inquire whether the defendant desires to waive the right to counsel; and
 

 5) the court shall make findings of the defendant's understanding and waiver of rights.
 

 ¶ 49 This list provides guidelines to assist trial judges in determining whether a defendant has the knowledge and understanding to waive an attorney for the penalty phase of a capital case, or any case in which the State may present aggravating circumstances and a defendant may present mitigating evidence.
 

 ¶ 50 Obviously, a competent attorney must understand the role of mitigating evidence, conduct a thorough investigation of possible mitigating evidence, and then make strategic choices, with the consultation of the client, regarding the presentation of the mitigating evidence.
 
 Wiggins v. Smith
 
 ,
 
 539 U.S. 510
 
 , 522-23,
 
 123 S.Ct. 2527
 
 , 2535,
 
 156 L.Ed.2d 471
 
 (2003). A
 
 pro se
 
 defendant must understand that without an attorney, his or her ability to do these things will be limited by a lack of experience and training in capital cases. Here, Fabion's waiver of an attorney was done without this specific understanding.
 

 ¶ 51 In three other subparts Fabion complains about the failure of the trial court to explain the role of standby counsel, the procedure to subpoena witnesses, and the ability to conduct legal research and view discovery from the county jail.
 

 ¶ 52 The role of standby counsel is necessarily a nebulous concept because every trial and case is unique. Clarification can almost seem impossible. In explaining what Fabion was giving up by choosing self-representation, the trial court expressed a very narrow view of the role of standby counsel. Initially, at the
 
 Faretta
 
 hearing, the trial court informed Fabion that he was on his own and he could not rely on standby counsel to assist him in any manner. He informed Fabion that standby counsel was nothing more than attorneys standing by. The lecture
 was obviously meant to give Fabion an understanding of the rights he was abandoning if he decided to represent himself.
 

 ¶ 53 The trial court, initially and appropriately, advised Fabion and standby counsel about standby counsel's limitations, so that Fabion would understand the import of self-representation. The trial court properly informed Fabion that there was only a potential chance that standby counsel would be ordered to take over, if the trial court felt it was necessary. This declaration is clearly in line with our holding in
 
 Stiner v. State
 
 ,
 
 1975 OK CR 156
 
 , ¶ 15,
 
 539 P.2d 750
 
 , 753,
 
 quoting
 

 Faretta
 
 ,
 
 422 U.S. 806
 
 , 834, fn 46,
 
 95 S.Ct. at 2541, fn 46
 
 .
 

 ¶ 54 The trial court also told Fabion, "That if you falter and change your mind and go, whoa, I'm in way over my head, now I need a lawyer, then potentially-potentially, at that point then they would take over." Fabion was advised that he could ask standby counsel questions, but he could not turn to standby counsel and ask them everything to do. Fabion was under no disillusionment about the role of standby counsel when he made his waiver of counsel. The dialogue during later hearings after the trial court found that Fabion had made a knowing and voluntary waiver bears no weight on this finding.
 

 ¶ 55 After the trial court had conducted the
 
 Faretta
 
 hearing and found Fabion made a knowing and voluntary waiver of counsel, Judge Elliott appointed two standby counsel, Assistant Public Defenders James Rowan and Catherine Hammarsten; Rowan for the first stage and Hammarsten for the second stage. Up until that point, they had been his appointed attorneys. This Court requires that standby counsel be appointed in all capital cases where an indigent defendant elects to go
 
 pro se
 
 .
 
 Lay
 
 ,
 
 2008 OK CR 7
 
 , ¶ 9,
 
 179 P.3d at 620
 
 . This Court also required such standby counsel to "be present at all proceedings to assist the defendant in self-representation but allow the defendant to maintain control of the case."
 
 Id
 
 .
 

 ¶ 56 Standby counsel's role, however, includes basic necessities in every case. We have determined that standby counsel should ensure that a
 
 pro se
 
 defendant have adequate access to a law library or suitable research equivalent which satisfies constitutional requirements.
 
 See
 

 Cardenas v. State
 
 ,
 
 1985 OK CR 21
 
 , ¶ 4,
 
 695 P.2d 876
 
 , 877-78. Standby counsel may also assist in that research when requested.
 

 ¶ 57 Standby counsel, as stated above, should ensure that a defendant has adequate access to a law library or share legal research and knowledge when requested. Access to a law library would include access to case law, statutory law and local court rules and procedures. This would include the method of issuing subpoenas, obtaining expert witnesses, and whether witnesses subpoenaed by the State must also be subpoenaed by a defendant. In a death penalty case this would also include information regarding the sentencing stage where the State presents evidence to support its aggravating circumstances and a defendant presents evidence in mitigation.
 

 ¶ 58 Standby counsel should be present at all court proceedings; standby counsel should be there to give solicited advice, but standby counsel cannot act for a
 
 pro se
 
 defendant, and has limitations so that he may neither give unsolicited advice, nor give the jury an appearance of representing defendant.
 
 McKaskle
 
 ,
 
 465 U.S. at 177
 
 ,
 
 104 S.Ct. at 950
 
 . Standby counsel can participate in the case as long as that participation does not destroy a jury's perception that a defendant has chosen self-representation and does not interfere with a defendant's actual control of the case.
 
 McKaskle
 
 ,
 
 465 U.S. at 178-79
 
 ,
 
 104 S.Ct. at 951
 
 .
 

 ¶ 59 The trial court, however, expected standby counsel to do nothing more than their "defined role." The trial court told counsel that they were under no obligation to visit with Fabion at all. He instructed the two attorneys to give Fabion the discovery, and told them that it was Fabion's responsibility to determine how to view the electronically recorded material. The trial court ultimately informed Fabion that issues with research and discovery could be resolved with motions, if necessary.
 

 ¶ 60 The trial court, contradictorily, informed Fabion that he could not seek legal
 advice from standby counsel because they no longer represented him. The trial court, however, told standby counsel there would be some leeway about handing notes to Fabion, if standby counsel perceived the "ship about to hit rocks." In this case, however, there is no showing that Fabion was denied or barred from using standby counsel as he deemed necessary.
 

 ¶ 61 Judge Elliott's contradictory and confusing pronouncements were just that; they had no bearing on Fabion's decision to waive counsel and choose self-representation. The pronouncements, however, may have confused standby counsel and Fabion.
 
 McKaskle
 
 holds that the role of standby counsel is limited on the extent of unsolicited participation.
 
 McKaskle
 
 ,
 
 465 U.S. at 177-78
 
 ,
 
 104 S.Ct. at
 
 950-51 ;
 
 Parker v. State
 
 ,
 
 1976 OK CR 293
 
 , ¶ 10,
 
 556 P.2d 1298
 
 , 1302. The
 
 pro se
 
 defendant is entitled to have control over the case he presents to the jury.
 
 McKaskle
 
 ,
 
 465 U.S. at 178
 
 ,
 
 104 S.Ct. at 951
 
 .
 
 McKaskle
 
 also holds that standby counsel may participate as long as the participation does not destroy a jury's perception that a defendant has chosen self-representation.
 
 McKaskle
 
 ,
 
 465 U.S. at 178-79
 
 ,
 
 104 S.Ct. at 950-51
 
 . Standby counsel, therefore, is free to participate as long as the participation does not undermine a defendant's control of the case and does not confuse a jury. If standby counsel is allowed to speak on any matter of importance, the
 
 Faretta
 
 right is eroded.
 

 Id.
 

 ¶ 62 While
 
 McKaskle
 
 is a case where the appellant complained about standby counsel's improper participation, no error was found where the participation was clearly invited and in no way undermined the right of self-representation. In this case we have no violation of the right to self-representation by "unsolicited and excessively intrusive participation by standby counsel."
 
 McKaskle
 
 ,
 
 465 U.S. at 177
 
 ,
 
 104 S.Ct. at 950
 
 .
 

 ¶ 63 Fabion clearly benefited from the trial court's request to have standby counsel assist him, when necessary. In this respect, Fabion basically acquiesced to standby counsel's participation, thus he cannot object.
 

 Id.,
 

 465 U.S. at 182
 
 ,
 
 104 S.Ct. at 953
 
 .
 
 Faretta
 
 does not require "hybrid" representation, but a defendant cannot complain if he elects, or acquiesces, to counsel's appearing before the court or jury.
 
 McKaskle,
 

 465 U.S. at 183
 
 ,
 
 104 S.Ct. at 953
 
 . The Court in
 
 McKaskle
 
 explained that
 
 Faretta
 
 rights are not infringed when standby counsel assists a
 
 pro se
 
 defendant in understanding procedure, protocol and etiquette.
 

 Id.
 

 ,
 
 465 U.S. at 183-84
 
 ,
 
 104 S.Ct. at 954
 
 . A defendant either accepts counsel or he elects to proceed
 
 pro se
 
 ; one or the other must be in charge in order to maintain orderly procedure.
 
 See
 

 Bowen v. State
 
 ,
 
 1980 OK CR 2
 
 , ¶ 20,
 
 606 P.2d 589
 
 , 594,
 
 quoting
 

 Smith v. State,
 

 1974 OK CR 60
 
 , ¶ 20,
 
 521 P.2d 832
 
 , 836,
 
 see also
 

 Thomas v. State
 
 ,
 
 1984 OK CR 19
 
 , ¶ 25,
 
 675 P.2d 1016
 
 , 1022 (holding a defendant may have representation by an attorney, or he may proceed
 
 pro se
 
 , but he may not have both concurrently). Here, however, there is no record that standby counsel either overstepped their bounds of standby counsel or limited their assistance to Fabion in any way.
 

 ¶ 64 Fabion complains about the trial court's pronouncement to standby counsel that, if Fabion changed his mind, standby counsel would step in, so they should be prepared to do so. During a hearing on March 20, the trial court stated, "you guys ... are appointed as standby counsel to step up and take over the case when or if he indicates to me that he wants a lawyer." Rowan, attempting to clarify the role of standby counsel, asked the trial court whether Fabion could ask the grounds for a proper objection and the trial court said, "Absolutely not."
 

 ¶ 65 The trial court limited standby counsel to preparations for a substitute role by stating, "If he decides at some point and conveys that to me that he no longer wishes to represent himself, at that point then you step up to the table and you assume responsibility of the case. ... [Y]ou're standby counsel, which in a lot of ways, perhaps not totally, you're an observer at this point."
 

 ¶ 66 Rowan asked for more clarification asking, "Are you telling me that I should actively be preparing for trial ...." The trial court stated,
 

 Absolutely. Because if he decides on day four he wants a lawyer, you step right in
 right then. If it's first stage you step in. If it's second stage, it's Ms. Hammarsten. Absolutely. Absolutely. ... He doesn't get to let jeopardy attach and then, who, Kings X, I want another lawyer and then the lawyer would be able to step and say, oh, I'm not prepared. Huh-huh. That's not the way the system works. Not the way I'm going to allow it to work. ... He's made his decision, ... which he can certainly change at any point. But when he does, then you step up to the table and you take over the process, if it's first stage, and Ms. Hammarsten in the second stage, if there is a second stage. (March 13, 2014, Tr. at 10-11)
 

 ¶ 67 Rowan expressed concern stating that the Oklahoma County public defender "shut the second stage down as far as expert witnesses and all of the preparation that goes into preparing a second stage." The trial court again stated that,
 

 A defendant doesn't get to go
 
 pro se
 
 and then in the middle of the proceeding after jeopardy is attached to say, I want another lawyer and then that lawyer who is standby doesn't get to say, whoa, I'm not prepared. ... Yes, you and Ms. Hammarsten will be expected to be prepared ... (March 13, 2014, Tr. at 12)
 

 ¶ 68 Standby counsel steps in and takes over, but is limited to the strategy prepared by the defendant.
 
 See, e.g.,
 

 State v. Richards
 
 ,
 
 552 N.W.2d 197
 
 , 207 (Minn.1996) (holding that standby counsel is at the mercy of the defendant's plans). There is no right to hybrid representation.
 
 See
 

 McKaskle
 
 ,
 
 465 U.S. at 183
 
 ,
 
 104 S.Ct. at 953
 
 (holding
 
 Faretta
 
 does not require hybrid representation),
 
 Parker
 
 ,
 
 1976 OK CR 293
 
 , ¶ 10,
 
 556 P.2d at 1302
 
 ,
 
 Stiner
 
 ,
 
 1975 OK CR 156
 
 , ¶ 14,
 
 539 P.2d at 753
 
 . Standby counsel does not get to start over with a new strategy and proceeding. Standby counsel and Fabion surely understood this because the trial court told standby counsel that they were limited to Fabion's
 
 pro se
 
 witness lists for first and second stage, should it become necessary for them to take over. Then, again, the trial court told the attorneys that they would, absolutely, be expected to be prepared.
 

 ¶ 69 Effective representation at the point that a
 
 pro se
 
 defendant is required to accept representation does not mean that standby counsel may hit reset and start a different trial strategy. When a
 
 pro se
 
 defendant has made strategic choices, standby counsel should be prepared to accept the strategic choices and take over. None of the trial court's orders regarding standby counsel's role, both active and passive would have created an issue had Fabion never indicated to standby counsel that he was "in over his head." The idea that standby counsel is limited to a defendant's strategy if it becomes necessary for standby counsel to take over inoculates counsel from ineffective claims, especially in cases where a defendant causes a situation where standby counsel must step in and take over the case.
 

 ¶ 70 Understandably, courts face a fine line between limiting standby counsel's participation and forbidding standby counsel from assisting at all. As long as standby counsel's participation does not create the perception before the jury that the defendant has not chosen self-representation, the participation is not harmful.
 

 ¶ 71 Here, the concept of standby counsel's role was not explained to this extent, so in proposition three, Fabion argues,
 
 citing
 

 Johnson
 
 ,
 
 1976 OK CR 292
 
 , ¶ 42, 556 P.2d at 1297, that the most important role of standby counsel is to take over the case if requested by the
 
 pro se
 
 defendant. This Court in
 
 Johnson
 
 actually held that the defendant had knowingly, voluntarily, and intelligently waived his right to counsel pursuant to the
 
 Faretta
 
 decision. This Court strongly encouraged trial courts to appoint standby counsel if a defendant waives his right to counsel. The opinion reasons that standby counsel is encouraged:
 

 If termination becomes necessary or if the defendant changes his mind and decides during the trial that he wants to be represented by counsel, a standby counsel would be able to step in and the trial could continue regardless of whether the defendant forfeits or relinquishes his right of self-representation.
 

 Id
 
 . Despite the fact that this language is
 
 dicta
 
 , as it was clearly not necessary to the
 decision in that case, the language is only an example of what may occur if a
 
 pro se
 
 defendant believes he can change his mind during trial and wishes to be represented by counsel.
 

 ¶ 72 The confusion in the record regarding the role of standby counsel alone does not rise to a level which would require reversal of this case, because Fabion has not shown that he was denied the assistance of standby counsel in any way. The confusion, however, does support a conclusion that Fabion was unaware of the rights he was giving up by waiving counsel in the punishment stage of this trial. The confusion regarding the role of standby counsel and our conclusion that Fabion was unaware of the punishment stage rights he was waiving lead this Court to reverse Fabion's death sentences and remand this case for a new sentencing proceeding.
 

 ¶ 73 At trial, Fabion's waiver of the right to have competent counsel assist in the presentation of mitigating evidence includes the waiver of competent presentation of that evidence. A defendant, therefore, should at least understand that mitigating evidence may be anything listed in Oklahoma Uniform Jury Instruction (OUJI) 4-79, as well as other evidence which might be considered as mitigating. So while a defendant must be informed of the possible defenses to the charges, he must also be informed about possible defenses to the aggravating circumstances and possible mitigating evidence which might be presented during the punishment stage of trial.
 

 ¶ 74 Here, there is absolutely nothing in the record to indicate that the trial court explained possible defenses to the aggravating circumstances or possible mitigating evidence. While neither the Eighth Amendment to the United States Constitution, nor corresponding provisions of the Oklahoma Constitution or statutes require that mitigating evidence be presented on behalf of a defendant, a defendant must be given the opportunity to present such evidence. Along with a waiver of that opportunity, there exists the necessity of a record indicating that a defendant was informed of the mitigating evidence he is forfeiting.
 
 Wallace
 
 ,
 
 1995 OK CR 19
 
 , ¶¶ 20-23,
 
 893 P.2d at 512-13
 
 .
 

 ¶ 75 There is no record in this case to indicate that Fabion sufficiently understood mitigating evidence. Compounding the failure to inform Fabion regarding defenses to second stage aggravators and possible mitigating evidence, is the method by which the trial court determined whether or not Fabion actually wanted counsel to represent him during the second stage. At the beginning of second stage, standby counsel notified the trial court that Fabion told her that he did not want to continue to represent himself. Standby counsel was questioned regarding the possibility of representing Fabion, and she explained she could not be prepared to present a second stage case that met her personal and professional standards without a continuance; the State argued against a continuance; and, when asked, Fabion stated he was ready to proceed to the second stage.
 

 ¶ 76 At that crucial point of trial, the trial court abandoned the idea that Fabion was representing himself. This was a matter of importance where counsel was asked to speak instead of Fabion, which eroded Fabion's
 
 Faretta
 
 right.
 

 ¶ 77 The trial court allowed standby counsel to take over and act as if Fabion was represented by counsel. Counsel, however, made an argument which was contrary to the interests of Fabion. At that point, Fabion was required to choose between counsel who refused to present mitigating evidence unless given a continuance or continue with self-representation. Counsel's argument, however, presumed that ineffectiveness would be attributed to her and not to Fabion's poor choices.
 

 ¶ 78 The trial court did not initially address Fabion. It appeared, therefore, that Fabion was no longer representing himself. The trial court, at best, gave everyone the impression that standby counsel was no longer standby, but was now representing Fabion and arguing for a continuance of the punishment phase of the death case. Then, of course, the trial court allowed the State to argue against a continuance. By the time the trial court addressed Fabion, the writing was on the wall, even though the trial court
 had not ruled on counsel's request for a continuance. Fabion had three choices: announce ready and present his second stage case for which he informed counsel he was unprepared to do, face a ruling denying a continuance where he would be represented by counsel who could not, in good conscience, proceed with Fabion's ill-prepared second stage case, or give up his right to a speedy trial and accept a ruling granting a continuance. Neither Fabion, nor counsel understood that counsel could be required to continue with Fabion's strategy at no consequence to counsel.
 

 ¶ 79 Fabion was now facing a trial court that, at the March 20 hearing, had told counsel to be prepared but was now learning that counsel was unprepared to take over the punishment stage, even with the witness Fabion had prepared for this phase of trial. The trial court did not address Fabion, the
 
 pro se
 
 litigant, until after attorneys had made their argument. We find this constituted error and violated Fabion's initial waiver of his right to counsel. As a
 
 pro se
 
 litigant his desires regarding continuing self-representation should have been addressed initially.
 

 ¶ 80 At this point Fabion no longer had standby counsel assisting him with the punishment phase of trial. He had an attorney whose argument indicated that professional interests had created a relationship adverse to the defendant. Understandably, standby counsel does not have to agree with a
 
 pro se
 
 defendant's strategic decisions in a trial. These disagreements, however, should not prevent standby counsel in assisting a defendant who asks for reasonable assistance. Fabion arguably understood at this point that standby counsel's interests had become adverse to his own.
 

 ¶ 81 This Court cannot predict what Fabion might have told the trial court had the trial court allowed him to speak first without the statements of standby counsel indicating that she had a professional conflict of interest preventing her from stepping in and taking over the case utilizing Fabion's second stage strategy. The trial court foreclosed that possibility by questioning counsel first. This dialogue clearly violated Fabion's right of self-representation as addressed in
 
 McKaskle
 
 .
 

 ¶ 82 The record supports a finding that Fabion made a knowing and voluntary decision to waive counsel and represent himself during the first stage.
 
 See
 

 Fitzgerald v. State
 
 ,
 
 1998 OK CR 68
 
 , ¶¶ 6-8,
 
 972 P.2d 1157
 
 , 1162-63 (approving a similar record). The record, however, does not support a finding that Fabion made a knowing and voluntary decision to waive counsel for the punishment stage of this proceeding. The death sentences in this case will, therefore, be reversed and the case will be remanded for resentencing. Upon remand the trial court will appoint counsel to represent Fabion Brown unless Brown makes a knowing and voluntary waiver of counsel not inconsistent with this Opinion.
 

 ¶ 83 In a related argument, in proposition eight, Fabion argues that the heightened standard of reliability required by the Eighth Amendment in rendering a penalty of death supersedes a defendant's right to self-representation in a capital sentencing proceeding. Appellant asks this Court to overrule established precedent and force representation upon a capital defendant during the second stage of a capital case.
 

 ¶ 84 We recognize that the right of self-representation is not absolute and the waiver of the right to counsel must be knowing and intelligent.
 
 Edwards v. Arizona
 
 ,
 
 451 U.S. 477
 
 , 482,
 
 101 S.Ct. 1880
 
 , 1884,
 
 68 L.Ed.2d 378
 
 (1981). As long as the dangers and pitfalls are understood by a defendant and the defendant does not deliberately engage in serious and obstructionist conduct, a lawyer will not be forced upon an unwilling defendant.
 
 Indiana v. Edwards
 
 ,
 
 554 U.S. 164
 
 , 170,
 
 128 S.Ct. 2379
 
 , 2383,
 
 171 L.Ed.2d 345
 
 (2008).
 

 ¶ 85 In
 
 Lay
 
 , however, this Court held that the right of self-representation is not limited by the type of trial, and a competent individual may waive counsel for any stage of a capital trial.
 
 Lay
 
 ,
 
 2008 OK CR 7
 
 , ¶ 5,
 
 179 P.3d at
 
 619 ;
 
 see
 

 Silagy v. Peters,
 

 905 F.2d 986
 
 , 1007 (7th Cir. 1990) (holding that
 
 Faretta
 
 grants a defendant the right to self-representation in a capital sentencing hearing and
 there exists no logical reason to deny a death-eligible defendant his Sixth Amendment right to self-representation).
 
 [6]
 
 Appellant has cited no new precedent which would cause this Court to overrule its holding in
 
 Lay
 
 . Furthermore, this Court's decision remanding the case for new sentencing renders this issue moot.
 

 III. JURY SELECTION ISSUES
 

 ¶ 86 In proposition seven, Fabion claims that his constitutional rights to a fair trial were violated when the trial court abused its discretion in excusing two prospective jurors for cause. He also argues that he was not allowed to rehabilitate one of these jurors who gave equivocal answers regarding his ability to impose the death penalty.
 

 ¶ 87 We review the manner and extent of a trial court's
 
 voir dire
 
 under an abuse of discretion standard.
 
 Littlejohn v. State
 
 ,
 
 2004 OK CR 6
 
 , ¶ 49,
 
 85 P.3d 287
 
 , 301. This Court will not reverse unless an abuse of discretion is shown. The manner and extent of
 
 voir dire
 
 rests within the discretion of the trial court.
 
 Black v. State
 
 ,
 
 2001 OK CR 5
 
 , ¶ 15,
 
 21 P.3d 1047
 
 , 1057. This Court will not disturb the verdict based on
 
 voir dire
 
 methods unless an abuse of discretion is shown, or the method is not constitutionally adequate.
 
 Id
 
 .,
 
 2001 OK CR 5
 
 , ¶ 23,
 
 21 P.3d at 1059-60
 
 .
 

 ¶ 88 In reviewing cases where the answers of potential jurors are unclear or equivocal, "this Court traditionally defers to the impressions of the trial court who can better assess whether a potential juror would be unable to fulfill his or her oath."
 
 Scott v. State
 
 ,
 
 1995 OK CR 14
 
 , ¶ 10,
 
 891 P.2d 1283
 
 , 1289. Moreover, it is not an abuse of discretion to deny counsel an opportunity to rehabilitate a potential juror if the trial court has sufficiently questioned the juror to make an informed decision.
 
 Littlejohn
 
 ,
 
 2004 OK CR 6
 
 , ¶ 49,
 
 85 P.3d at 301
 
 . The trial court is not required to allow the parties to rehabilitate potential jurors.
 
 Duvall v. State
 
 ,
 
 1991 OK CR 64
 
 , ¶ 25,
 
 825 P.2d 621
 
 , 631.
 

 ¶ 89 When the proper questions have been asked by the trial court to determine whether prospective jurors can sit in the case, it is not error to deny defense counsel an opportunity to rehabilitate the excused jurors.
 
 Scott
 
 ,
 
 1995 OK CR 14
 
 , ¶ 11,
 
 891 P.2d at 1290
 
 . Furthermore, when a juror's views on capital punishment would "prevent or substantially impair the performance of his duties," removal for cause is proper.
 
 Williams v. State
 
 ,
 
 2001 OK CR 9
 
 , ¶ 10,
 
 22 P.3d 702
 
 , 709.
 

 ¶ 90 Juror M.W., during individual
 
 voir dire
 
 , expressed a belief that imposing death would be tough due to religious beliefs. M.W. was able to say that meaningful consideration could be taken for all three punishment options. M.W., however, admitted that his religious teachings would place him in a camp of never imposing a penalty of death. From the record it appears that M.W. might consider all three punishment options, but would not actually sentence a defendant to death, regardless of the facts. The trial court did not abuse its discretion in determining that M.W. would not give meaningful consideration to all three punishment options, thus the removal for cause was not an abuse of discretion.
 

 ¶ 91 Juror D.M., also during individual
 
 voir dire
 
 , expressed reluctance in imposing the penalty of death. Initially potential juror D.M. would not consider the death penalty regardless of the law and facts. The trial court utilized the uniform instructions and D.M. clearly indicated that the death penalty would not be considered. Again, there was no abuse of discretion here, and the trial court did not abuse its discretion in not allowing Fabion to attempt to rehabilitate the potential juror.
 

 ¶ 92 Both of these jurors gave unequivocal answers about their ability to consider the death penalty. The trial court sufficiently questioned both of the potential jurors to make an informed decision about their ability to truthfully consider all three punishment
 options. The method of
 
 voir dire
 
 and the decision to excuse these two potential jurors for cause did not amount to an abuse of discretion.
 

 IV. FIRST STAGE TRIAL ISSUES
 

 ¶ 93 Fabion argues, in proposition two, that he was deprived of due process many times during trial because the trial court denied specific requests. Fabion raises three sub-propositions, A-C. The first sub-proposition is divided into three parts.
 

 ¶ 94 In sub-proposition A, Fabion claims that Judge Elliott restricted his ability to call witnesses. He first references arguments made in proposition one where he expressed that he needed to know how to get subpoenas out. He argues that the trial court would not offer suggestions on issuing subpoenas and prohibited standby counsel from doing so as well. This argument is somewhat disingenuous.
 

 ¶ 95 The trial court advised Fabion that he was forbidden from giving legal advice. When viewing the record as a whole, it becomes clear that the trial court prohibited standby counsel from giving unsolicited advice. The trial court, however, did tell Fabion that he could ask standby counsel questions.
 

 ¶ 96 Despite his ignorance about issuing subpoenas, Fabion stated he was ready to represent himself. Due to his
 
 pro se
 
 representation at trial, he cannot raise ineffective assistance on appeal, thus he cannot develop a record which indicates who he might have called as a witness. There is no indication in the record that Fabion failed to get subpoenas issued to witnesses he desired.
 

 ¶ 97 Next, Fabion claims that the trial court denied him the right to call witnesses who had been subpoenaed and called to testify by the State. Fabion attempted to call Detective Harkins during an "other crimes" motion hearing. The trial court had limited Fabion's cross examination due to a question outside the scope of direct, and irrelevant questions, then when Fabion wanted to call him as his own witness, the trial court told Fabion he could not recall him because he "had ample opportunity to ask him all of the questions you wanted to ask him." Fabion has completely failed to show that he was prejudiced by this limitation. Any possible or imagined error is clearly harmless. Nothing here affected Fabion's trial rights.
 

 ¶ 98 Fabion claims, next, that the trial court would not allow him to call a different witness during the same motion hearing, because of a "rule of sequestration," which had never been ordered. The rule of sequestration had been ordered February 6, 2014, and this
 
 Burks
 
 hearing was on March 20, 2014. Neither the motion nor the order was limited to trial witnesses. The referenced witness, Kelly Haley, was present at the hearing and was subject to the rule of sequestration ordered by the court. There was no abuse of discretion here.
 

 ¶ 99 Fabion further complains that the trial court limited the opportunity to raise complaints about his trial counsel. In fact, as part of the
 
 Faretta
 
 hearing and Fabion's
 
 pro se
 
 filings, his complaints were well documented. His complaints, as stated under a prior proposition, were nothing more than personality conflicts and did not rise to the level of ineffective assistance which would be grounds for the substitution of counsel.
 

 ¶ 100 Fabion claims that he was denied access to legal research. Fabion's complaints are not supported by the record. The record is clear that the trial court gave Fabion opportunities to address issues with access to legal research by the use of motions. The record is also clear that Fabion indicated that standby counsel had assisted with legal research. This complaint has no basis.
 

 ¶ 101 In proposition four Fabion claims that a
 
 Brady
 

 [7]
 
 violation occurred when the trial court refused to allow him to have a copy of Emily Matheson's mental health report. Fabion requested the report, the trial court read the report, and the trial court
 ruled that the information was not exculpatory nor was it relevant.
 

 ¶ 102 "Due process requires the State to disclose exculpatory and impeachment evidence favorable to an accused.
 
 See
 

 United States v. Bagley,
 

 473 U.S. 667
 
 ,
 
 105 S.Ct. 3375
 
 ,
 
 87 L.Ed.2d 481
 
 (1985),
 
 Giglio v. United States,
 

 405 U.S. 150
 
 ,
 
 92 S.Ct. 763
 
 , 31 L.Ed.2d [104] ( 1972),
 
 Brady v. Maryland,
 

 373 U.S. 83
 
 ,
 
 83 S.Ct. 1194
 
 ,
 
 10 L.Ed.2d 215
 
 (1963) and
 
 Napue v. Illinois,
 

 360 U.S. 264
 
 ,
 
 79 S.Ct. 1173
 
 ,
 
 3 L.Ed.2d 1217
 
 (1959)."
 
 Wright v. State,
 

 2001 OK CR 19
 
 , ¶ 22,
 
 30 P.3d 1148
 
 , 1152. To establish a
 
 Brady
 
 violation, a defendant must show that the prosecution failed to disclose evidence that was favorable to him or exculpatory, and that the evidence was material.
 
 Jones v. State
 
 ,
 
 2006 OK CR 5
 
 , ¶ 51,
 
 128 P.3d 521
 
 , 540-41 ;
 
 Paxton v. State,
 

 1993 OK CR 59
 
 , ¶ 15,
 
 867 P.2d 1309
 
 , 1318.
 

 ¶ 103 Material evidence must create a reasonable probability (a probability sufficient to undermine confidence in the outcome) that the result of the proceeding would have been different had the evidence been disclosed.
 
 Bagley,
 

 473 U.S. at 682
 
 , 105 S.Ct. at 3383. The mere possibility that an item of undisclosed information might have helped the defense or affected the outcome does not establish materiality.
 
 Knighton v. State,
 

 1996 OK CR 2
 
 , ¶ 43,
 
 912 P.2d 878
 
 , 890.
 

 ¶ 104 The burden is on Fabion to show that, without considering the intent of the prosecution, the evidence was: 1) suppressed by the prosecution, 2) favorable to the accused, and 3) material as to guilt or punishment.
 
 Brady
 
 ,
 
 373 U.S. at 87
 
 ,
 
 83 S.Ct. at 1196-97
 
 . The duty to disclose evidence favorable to an accused includes impeachment as well as exculpatory evidence.
 
 Bagley
 
 ,
 
 473 U.S. at 676
 
 , 105 S.Ct. at 3380.
 

 ¶ 105 Here the report was not material to the case. "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."
 
 Bagley
 
 ,
 
 473 U.S. at 682
 
 , 105 S.Ct. at 3383. The question is not whether the verdict more likely than not would have been different, "but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."
 
 Kyles v. Whitley
 
 ,
 
 514 U.S. 419
 
 , 434,
 
 115 S.Ct. 1555
 
 , 1566,
 
 131 L.Ed.2d 490
 
 (1995).
 

 ¶ 106 The mere possibility that an item of undisclosed information might have helped the defense or affected the outcome does not establish materiality.
 
 Knighton
 
 ,
 
 1996 OK CR 2
 
 , ¶ 43,
 
 912 P.2d at 890
 
 .
 

 ¶ 107 After thorough consideration, we find the report on Matheson was not material according to the standard in
 
 Bagley
 
 ,
 
 473 U.S. at 682
 
 , 105 S.Ct. at 3383. Fabion received a verdict worthy of confidence even in the absence of the Matheson examination report.
 

 ¶ 108 Dr. Poyner only reported that Matheson was depressed and had some interpersonal relationship disorders. Matheson was not suffering from a serious or pervasive mental illness. Matheson's personality disorders were not relevant to her credibility. There were no disorders which prevented Matheson from perceiving matters and testifying about them in a truthful manner.
 

 ¶ 109 Fabion's reliance on
 
 Browning v. Trammell
 
 ,
 
 717 F.3d 1092
 
 (10th Cir.2013), is not persuasive. In
 
 Browning
 
 , a witness was diagnosed as having a severe mental illness which affected her ability to recount events accurately. The witness was prone to homicidal acts and motivations. The witness had memory deficits and blurred reality and fantasy. Her ability to observe and remember events was impaired.
 

 Id.
 

 ,
 
 717 F.3d at 1094-1101
 
 .
 

 ¶ 110 Here the report on Matheson does not make any conclusions that she was suffering a mental illness so severe that she could not recall events. There is no error here.
 

 ¶ 111 Fabion complains, in proposition five, the trial court erred in improperly allowing evidence showing that the victim, Jessica Brown, was afraid of him. Fabion admits that this type of evidence is admissible under a "state of mind" exception.
 

 "Such antecedent declarations by a decedent are admissible in a homicide case to
 show the decedent's state of mind toward the defendant or to supply the motive for killing."
 
 Welch v. State
 
 ,
 
 2000 OK CR 8
 
 , ¶ 28,
 
 2 P.3d 356
 
 , 370.
 

 Testimony showing ill feeling, threats, or similar conduct by one spouse toward another in a marital homicide case is relevant and statements by the deceased expressing fear of a spouse are admissible under the state of mind exception to the hearsay rule
 

 Washington v. State
 
 ,
 
 1999 OK CR 22
 
 , ¶ 36,
 
 989 P.2d 960
 
 , 973.
 

 ¶ 112 Fabion, however, argues that the amount of evidence was cumulative and unduly prejudicial. There were no objections to the admission of this evidence at trial, thus this Court is limited to a review for plain error only.
 
 Hogan v. State
 
 ,
 
 2006 OK CR 19
 
 , ¶ 38,
 
 139 P.3d 907
 
 , 923. To be entitled to relief for plain error, a defendant must show: (1) the existence of an actual error; (2) that the error is plain or obvious; and (3) that the error affected his substantial rights, meaning that the error affected the outcome of the proceeding.
 

 Id.
 

 ¶ 113 The evidence was not cumulative, as each witness who testified about Jessica Brown's fear, relayed information about different aspects or factual situations which showed Jessica's fear. Jessica's friends, her mother, and her divorce attorney all testified about information which showed Jessica was afraid of Fabion. Their testimony did not deprive Fabion of a fair trial which lacked due process. This proposition does not rise to the level of error which is clear or plain on the record. The alleged error, therefore, cannot meet the threshold criteria of plain error.
 

 ¶ 114 In proposition six, Fabion claims that the trial court's directions to the jury regarding ordering pizza coerced them into reaching a first stage verdict without proper deliberations. The trial court's directions, verbatim, were:
 

 For the record, it is 5:51.
 

 Now, in reference to the meal. [sic] If you decide, and it's your decision, if you decide as a jury you wish to have a pizza delivered, this is the process. You press the buzzer. The bailiff will come up and the foreperson will tell the bailiff, you would like to see the menus.
 

 She will then come downstairs, get the menus and bring an individual menu up for each of you. You are allowed to order up to and no more than four large pizzas. Okay? And then one soda or water per person [sic]. Okay?
 

 And you write it down on the yellow tablet, exactly, specifically what you want ordered. If it says pepperoni, you're going to get pepperoni. If you wanted ham, too bad [sic]. It said pepperoni. Write it down exactly the way you want it ordered that is available on the menu.
 

 If there is no Coke on the-Coca Cola on the menu, don't write Coca Cola because it says Pepsi. Okay?
 

 Because if you write something down that's not on the menu, it doesn't get ordered and not our problem. Okay? Write it down specifically off the menu. Okay? Once that is done, then you press the buzzer again. The bailiff will come up. And the foreperson, no one else, goes to the door and says nothing more than, here's our order.
 

 She will then come downstairs and order it. It takes about an hour to get it here after you give it to her. Okay? And that's depending on how busy they are.
 

 There is only one pizza place that delivers for us on credit. A place called Joey's Pizza that's over here on Film Row downtown. Because since we're a government agency, it has to be done on credit and they have been very kind to us and agreed to do that and they will deliver today and get paid in 30 days.
 

 So that's the only place that's available. If you don't like that, can't eat that, don't want that, then I explained those contingencies to you last evening. That's the way it is. Okay?
 

 But be mindful, that it takes approximately, depending on how busy they are, but it averages right at an hour to get to you after you give the order to the bailiff.
 

 Now, having said that, if you believe, and this is your choice, if you believe you are near getting a verdict and you will have a
 verdict in less than a [sic] hour, don't order the pizza. Okay?
 

 And I hope the reasons there are obvious. Okay? I try to be a steward of the taxpayer money. But if you order it, if you want it, we'll order it. But I've had two or three juries who order it and then five minutes later have a verdict and then they get to wait instead of going home to eat the pizza that they ordered.
 

 So again that is your choice. And if you decide you want it, it will be ordered.
 

 Okay. That's the process. ...
 

 With that for the record, it's 5:54.
 

 (Vol. IX, Tr. 227-29) (Transcribed verbatim) Moments thereafter, the jury retired to deliberate and returned with a verdict at 6:41 p.m. Fabion claims that this "lecture about pizza" caused them to return a verdict without due deliberations. Fabion, however, did not object to the instruction at trial. This Court, therefore, is limited to a review for plain error.
 
 Hogan
 
 ,
 
 2006 OK CR 19
 
 , ¶ 38,
 
 139 P.3d at 923
 
 .
 

 ¶ 115 Instructions given to the jury are a matter of judicial discretion.
 
 Postelle v. State
 
 ,
 
 2011 OK CR 30
 
 , ¶ 38,
 
 267 P.3d 114
 
 , 132. There are no Uniform Jury Instructions on the ordering of dinner; therefore, the trial court is bound only by existing law and good judgment.
 

 If the court determines that jurors should be instructed on a matter not included within the Uniform Jury Instructions, the court should give an instruction that is "simple, brief, impartial and free from argument." 12 O.S.2001, § 577.2.
 

 Id.
 
 ¶ 55,
 
 267 P.3d at 137
 
 ,
 
 citing
 

 Johnson v. State
 
 ,
 
 2009 OK CR 26
 
 , ¶ 4,
 
 218 P.3d 520
 
 , 522. A trial court's instructions should never influence jurors in their decision-making process.
 
 Johnson
 
 ,
 
 2009 OK CR 26
 
 , ¶ 4,
 
 218 P.3d at 522
 
 . In this case, there is no indication that the instruction influenced the jurors to reach a verdict. No plain error occurred in this instruction, as the instruction did not affect the outcome of this case.
 

 ¶ 116 This Court, therefore, finds no error in the first stage of this trial requiring reversal of Fabion's convictions and his sentence in the conspiracy count.
 

 IV. DEATH PENALTY PUNISHMENT ISSUES
 

 ¶ 117 Along with Fabion's arguments, in propositions three and eight, that due process and the demand for a reliable sentencing proceeding require that an attorney be forced upon an unwilling defendant in the punishment stage of a death penalty case, he also argues, in proposition nine, that the death penalty, in and of itself constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article II, §§ 7, 9 and 20 of the Oklahoma Constitution.
 

 ¶ 118 These propositions are rendered moot by this Court's decision to remand this case for resentencing. Nevertheless, Fabion's proposition is primarily supported by dissenting opinions of United States Supreme Court Justices Bryer and Ginsburg in
 
 Glossip v. Gross
 
 , 576 U.S. ----,
 
 135 S.Ct. 2726
 
 ,
 
 192 L.Ed.2d 761
 
 (2015). Fabion's argument includes assertions that the death penalty's administration is unreliable, arbitrarily imposed, excessively delayed, and declining in use.
 

 ¶ 119 Fabion has cited no controlling precedent which overrules the existing and overwhelming case law upholding the constitutionality of the death penalty.
 
 See
 

 Miller v. State
 
 ,
 
 2013 OK CR 11
 
 , ¶ 213,
 
 313 P.3d 934
 
 , 998 (reaffirming this Court's long standing holding that the death penalty does not constitute cruel and unusual punishment).
 

 V. CUMULATIVE ERROR AND MANDATORY SENTENCE REVIEW
 

 ¶ 120 In proposition ten, Fabion claims that the accumulation of error deprived him of due process of law and a reliable sentencing hearing. This proposition is moot due to our finding that error requires reversal of Fabion's death sentences and remand for resentencing. Furthermore, our statutorily mandated sentence review is no longer relevant based on reversal of the death sentences and remand for resentencing.
 

 VI. DECISION
 

 ¶ 121 The Judgment of the district court on counts one and two (first degree murder) is
 
 AFFIRMED
 
 . The death sentences, however, are
 
 REVERSED
 
 and the case is
 
 REMANDED
 
 to the district court for resentencing. The Judgment and Sentence for count three (conspiracy) is
 
 AFFIRMED
 
 . Pursuant to Rule 3.15,
 
 Rules of the Oklahoma Court of Criminal Appeals
 
 , Title 22, Ch.18, App. (2018), the
 
 MANDATE
 
 is
 
 ORDERED
 
 issued upon the delivery and filing of this decision.
 

 LUMPKIN P.J.: Specially Concur
 

 HUDSON, J.: Specially Concur
 

 WINCHESTER, J.: Concur
 

 WALKLEY, J.:
 
 [8]
 
 Specially Concur
 

 LUMPKIN, PRESIDING JUDGE: SPECIALLY CONCURRING
 

 ¶ 1 I concur in affirming the judgment of guilt and remanding the case for resentencing. I also want to compliment my colleague for a well reasoned opinion that gives guidance to the bench and the bar. I write separately to address Appellant's waiver of counsel and
 
 pro se
 
 representation.
 

 ¶ 2 Under the circumstances of this case, the trial judge should have made a more detailed inquiry of Appellant at the start of the second stage of trial and clarified what, if any, concerns he had regarding the assistance of counsel. As it stands, we are uncertain whether Appellant's valid waiver of counsel during the first stage of trial survived into the second stage of the proceedings.
 

 ¶ 3 As discussed in the opinion, the trial court's first stage warnings about self-representation were adequate to find a valid Sixth Amendment waiver of counsel. Also, as stated in the opinion, during the second stage, the trial court initially appropriately advised Appellant and standby counsel about standby counsel's limited role. The problem occurred when, after being notified by standby counsel, and not Appellant, that Appellant told counsel that he did not want to continue to represent himself, the trial court turned the discussion to counsel, and not Appellant. Once the trial court was informed Appellant no longer wanted to represent himself, the trial court had a duty to question Appellant, who was still proceeding
 
 pro se
 
 at that point, regarding his desire to proceed
 
 pro se
 
 or with standby counsel.
 

 ¶ 4 While neither the United States Supreme Court nor this Court have addressed a situation like the one before us and set forth specific warnings to be given a
 
 pro se
 
 defendant during the penalty phase of a capital case, this Court's opinion in
 
 Wallace v. State
 
 ,
 
 1995 OK CR 19
 
 ,
 
 893 P.2d 504
 
 (involving a defendant's waiver of the right to present mitigating evidence in a capital trial) includes an admonishment which would serve the trial bench well when formulating the requisite second stage
 
 Faretta
 
 warning. The guidelines in
 
 Wallace
 
 require the trial court to ensure that the defendant has an understanding of his or her rights in the sentencing process.
 

 The court must inform the defendant of the right to present mitigating evidence, and what mitigating evidence is ... The trial court must inquire of a defendant and make a determination on the record whether the defendant understands the importance of mitigating evidence in a capital sentencing scheme, understands such evidence could be used to offset the aggravating circumstances proven by the prosecution in support of the death penalty, and the effect of failing to present that evidence.
 

 Id.
 

 ,
 
 1995 OK CR 19
 
 , ¶ 21,
 
 893 P.2d at 512-13
 
 . By determining that the defendant understands these concepts, the trial court will make a sufficient record for the purposes of
 
 Faretta
 
 . "Whether there has been a valid waiver of right to counsel is to be determined from the total circumstances of the individual case including background, experience and conduct of the accused."
 
 Braun v. State
 
 ,
 
 1995 OK CR 42
 
 , ¶ 12,
 
 909 P.2d 783
 
 , 788.
 

 ¶ 5 On remand, the trial court should warn Appellant as it did in the first stage of trial regarding the dangers of self-representation
 but with further emphasis on the particularities of the sentencing phase of a capital trial.
 
 See
 

 Mitchell v. State
 
 ,
 
 2016 OK CR 21
 
 , ¶ 4,
 
 387 P.3d 934
 
 , 937,
 
 citing
 

 Faretta v. California
 
 ,
 
 422 U.S. 806
 
 , 835,
 
 95 S.Ct. 2525
 
 , 2541,
 
 45 L.Ed.2d 562
 
 (1975) ("[a] defendant must be warned of the dangers and disadvantages of self-representation, based on all the circumstances of the case."). The trial court should ensure that Appellant is made aware that self-representation results in the waiver of any claim of ineffective assistance on appeal and that the trial court will not effectively operate as counsel or co-counsel for the defendant.
 
 Coleman v. State
 
 ,
 
 1980 OK CR 75
 
 , ¶ 8,
 
 617 P.2d 243
 
 , 246.
 

 ¶ 6 As the opinion states, on remand, if Appellant makes a knowing and voluntary waiver of counsel pursuant to the requirements of
 
 Faretta,
 
 standby counsel should be appointed. It is worth repeating that both Appellant and attorneys appointed as standby counsel should be informed as to standby counsel's limited role,
 
 McKaskle v. Wiggins
 
 ,
 
 465 U.S. 168
 
 , 177,
 
 104 S.Ct. 944
 
 , 950,
 
 79 L.Ed.2d 122
 
 (1984), and particularly as it pertains to the punishment phase of trial.
 

 ¶ 7 I find the analysis in
 
 United States v. Taylor
 
 ,
 
 933 F.2d 307
 
 , 312-13 (5th Cir. 1991)
 
 citing
 

 McKaskle,
 

 465 U.S. at 177-78
 
 ,
 
 104 S.Ct. at 950-51
 
 , instructive as the Fifth Circuit Court of Appeals delineated the limited nature of standby counsel's role as:
 

 The defendant preserves actual control over the case he presents to the jury: standby counsel cannot substantially interfere with any significant tactical decisions, cannot control the questioning of witnesses, and cannot speak in place of the defendant on any matter of importance. Standby "counsel" is thus quite different from regular counsel. Standby counsel does not represent the defendant. The defendant represents himself, and may or may not seek or heed the advice of the attorney standing by. As such, the role of standby counsel is more akin to that of an observer, an attorney who attends the trial or other proceeding and who may offer advice, but who does not speak for the defendant or bear responsibility for his defense.
 

 Taylor
 
 ,
 
 933 F.2d at 312-13
 
 .
 

 ¶ 8 "In determining whether a defendant's
 
 Faretta
 
 rights have been respected, the primary focus must be on whether the defendant had a fair chance to present his case in his own way."
 
 McKaskle
 
 ,
 
 465 U.S. at 177
 
 ,
 
 104 S.Ct. at 950
 
 . "The
 
 pro se
 
 defendant is entitled to preserve actual control over the case he chooses to present to the jury" and he must be "allowed to address the court freely on his own behalf."
 

 Id.
 

 ,
 
 465 U.S. at 179
 
 ,
 
 104 S.Ct. at 951
 
 . Since a
 
 pro se
 
 defendant's control of his own defense may be undermined or eroded by standby counsel's "unsolicited participation" the Supreme Court requires trial courts to limit standby counsel's role.
 

 Id.
 

 ,
 
 465 U.S. at 177
 
 ,
 
 104 S.Ct. at 950
 
 . Standby counsel does not appear before the court or the jury on the
 
 pro se
 
 defendant's behalf.
 

 Id.
 

 ,
 
 465 U.S. at 183
 
 ,
 
 104 S.Ct. at 953
 
 . Standby counsel is appointed for the purpose of relieving the judge of "the need to explain and enforce basic rules of courtroom protocol or to assist the defendant in overcoming routine obstacles that stand in the way of the defendant's achievement of his own clearly indicated goals."
 
 Id
 
 .,
 
 465 U.S. at 184
 
 ,
 
 104 S.Ct. at 954
 
 .
 

 ¶ 9 This law clearly indicates that standby counsel is to be prepared to try the case should Appellant desire, but standby counsel is to try the case as Appellant desires-even if that is different from the way standby counsel would have tried the case. This advisory role should include standby counsel assisting in discovery and the securing of defense witnesses. The trial court should so advise both Appellant and attorneys appointed to serve as standby counsel. As the opinion strongly points out, the trial judge in this case admonished counsel that standby counsel must be prepared to proceed immediately with the trial if Appellant decides he wants standby counsel to step in and take over the trial of the case.
 

 ¶ 10 Further, in light of the Supreme Court's decision in
 
 McKaskle
 
 , it appears that a preliminary instruction to the jury explaining the role of standby counsel when a defendant has elected to waive his or her right to counsel and to represent themselves at trial
 is warranted to protect a
 
 pro se
 
 defendant's right to control his or her own defense. I suggest the following instruction be forwarded and formatted by the Oklahoma Uniform Jury Instruction Committee-Criminal:
 

 Ladies and gentlemen of the jury, the 6th Amendment to the United States Constitution guarantees that a person charged with a crime has the right to the assistance of counsel. This Constitutional guarantee also provides that an individual charged with a crime has the right to waive representation by legal counsel and proceed to trial representing themselves and act as their own attorney. The defendant has elected to waive his/her right to counsel and represent his/herself in this matter. Mr./Mrs./Ms. __________________ has been appointed as standby counsel to the defendant but not to act as his/her attorney in this case. The role of standby counsel is limited to answering the defendant's questions and providing other assistance but standby counsel will not be participating directly in the trial. In electing to represent himself/herself, the defendant has assumed the full responsibility of acting as his/her own attorney in this case and will be held to the same standards and requirements of an actual practicing attorney. Standby counsel will be available to answer the defendant's questions during the course of the trial but the defendant will solely make all of decisions concerning his/her defense. You are not to let the fact that the defendant has elected to represent himself/herself influence your decision in this case. Instead, you must decide this case based upon the law in the court's instructions and the evidence received during the course of the trial.
 

 HUDSON, J., SPECIALLY CONCURS
 

 ¶ 1 This case demonstrates the critical need for the trial judge to advise aspiring
 
 pro se
 
 capital defendants of the specific warnings contained in
 
 Wallace v. State
 
 ,
 
 1995 OK CR 19
 
 , ¶ 21,
 
 893 P.2d 504
 
 , 512-513 concerning mitigating evidence and the capital sentencing process. This information, in my view, should be conveyed during the initial
 
 Faretta
 
 inquiry so the defendant will understand up front the nature of his or her rights and the importance and purposes of the capital sentencing process. In this way, the defendant will understand fully the high stakes and potential consequences of self-representation in a capital case.
 

 ¶ 2 Additionally, the trial court must also inquire of a
 
 pro se
 
 defendant if, at any point during the trial, it appears the defendant wants standby counsel to take over the case. This should include a full inquiry of the matter on the record and an unequivocal statement by the defendant should he decide he wants standby counsel to takeover. Because these things were not done in the present case, I concur in today's decision.
 

 ¶ 3 I agree with the majority that, when standby counsel takes over midtrial, he or she must simply takeover wherever the defendant has left off and work from there. The defense is not entitled to a mistrial or continuance such that a new strategy may be implemented. Trial courts must clearly explain to aspiring
 
 pro se
 
 defendants up front that they will not get a "redo" of their trial if standby counsel takes over the defense of the case midtrial at the defendant's request. In other words, the defendant who makes his proverbial bed by representing himself at trial must lay in the mess of his own creation even when standby counsel takes over midtrial. This should also be conveyed to a
 
 pro se
 
 defendant anytime he requests standby counsel to take over the case.
 

 ¶ 4 Moreover, once standby counsel takes over the case, the defendant is no longer "in charge". As explained by the majority, there is no hybrid representation. No longer does the defendant "control the organization and content of his own defense" or have the authority "to make motions, to argue points of law, to participate in voir dire, to question witnesses, and to address the court and the jury at appropriate points in the trial."
 
 McKaskle v. Wiggins
 
 ,
 
 465 U.S. 168
 
 , 174,
 
 104 S.Ct. 944
 
 , 949,
 
 79 L.Ed. 2d 122
 
 (1984). This too must be clearly explained to the
 
 pro se
 
 defendant who expresses a desire for standby counsel to intervene and take over the case.
 

 ¶ 5 Finally, I agree that the jury instruction proposed in Judge Lumpkin's special writing is one possibility for use when faced
 with a defendant who represents himself at trial. However, I believe the matter should be referred to the OUJI committee for study and recommendation of a uniform jury instruction.
 

 WALKLEY, JUDGE (By Special Appointment to the Court): SPECIALLY CONCURRING
 

 ¶ 1 I also concur in affirming the judgment of guilt and remanding the case for resentencing. However, due to the nature of the issues arising from the waiver of counsel and the role of standby counsel in this matter, further guidance for the trial court is necessary.
 

 ¶ 2 I take no issue with the Opinion nor with P.J. Lumpkin and J. Hudson's Specially Concurring Opinions and would adopt the recitation of facts, law and conclusions contained therein. In particular, as it relates to the resentencing in this matter, I agree that the trial court should re-address the
 
 Faretta
 
 factors as it relates to the sentencing phase of a capital trial, consistent with the Opinion in this matter. However, this case also demonstrates the need for the trial court to define the role of standby counsel in any case that a defendant chooses to waive his/her right to counsel, whether that matter is a capital case or non-capital matter where standby counsel is assigned.
 

 ¶ 3 While the role of standby counsel is a nebulous concept and hard line rules would not be prudent due to the variations within each individual case, clarification by the trial court is possible and should be required. The requirements of any individual case would be known by the trial court and the scope and limitations of standby counsel should be set at the time of appointment of standby counsel. As this often happens in conjunction with the
 
 Faretta
 
 hearing, it is appropriate for the trial court to advise a defendant of the scope and limitation at that time. The first consideration should be to determine the scope of assistance a defendant is requesting. The ABA Standards, in conjunction with the holding in
 
 McKaskle v. Wiggins
 
 ,
 
 465 U.S. 168
 
 ,
 
 104 S.Ct. 944
 
 ,
 
 79 L.Ed.2d 122
 
 (1984), define two scopes of representation for defense counsel in assisting a
 
 pro se
 
 litigant: (1) Active assistance while permitting "the accused to make the final decision on all matters, including strategic and tactical matters relating to the conduct of the case, or (2) Assistance only when requested by the accused.
 
 ABA Defense Function Standard 4-3.9
 
 . At a minimum, a defendant should be advised that standby counsel shall be required to attend all court proceedings and shall ensure that a defendant has adequate access to legal research as more fully set forth in the Opinion of this matter.
 

 ¶ 4 In addition, once the broad scope of assistance is established, a trial court should then determine, inter alia, whether standby counsel is required to perform any of the following tasks:
 

 Assist in any investigation of the case
 

 Identify or prioritize issues on which the defendant should focus attention
 

 Develop a full understanding of the prosecution's records, documents, reports and other investigations pertaining to the case Assist in specific areas or aspects of the case (e.g., discovery, subpoenas)
 

 Undertake research and render advice about specific areas of the law applicable to the case
 

 Interview, research or develop knowledge about witnesses Assist the defendant in locating witnesses helpful to the defense, including expert witnesses
 

 Bring to the attention of the defendant matters beneficial to the defendant.
 

 ¶ 5
 
 McKaskle
 
 clearly defines the limitations on standby counsel. These limitations should be clearly stated to ensure that an accused is making an informed decision to proceed
 
 pro se
 
 . For example, the trial court should make it clear that the defendant alone is responsible for the preparation and presentation of that defendant's case. Furthermore, it should be made clear that standby counsel is not an advocate, and will play no advocacy role in hearings, pleadings, or at trial unless directed by the Court to assume the defense. If standby counsel is directed by the trial court to assume the defense, the defendant should be cautioned that standby counsel is bound by the tactical and strategic decisions made by the defendant and that
 standby counsel is not subject to an ineffective assistance of counsel claim when bound by those strategic/tactical decisions of the defendant. In addition, a defendant should be aware that, during trial, standby counsel may answer the defendant's questions of law and courtroom procedure, but may not interject himself/herself into the case without the consent of the defendant. Other case specific limitations should also be delineated at this time such as the fact that standby counsel will not serve as a defendant's lackey or legal assistant. However, as stated by Judge Hudson, a defendant should be advised that if standby counsel assumes control over a case, whether by court order or at defendant's request, that the defendant will no longer "control the organization and content of the defense" from that point forward.
 
 See McKaskle
 
 .
 

 ¶ 6 For these reasons, while I concur with the Opinion in this matter as well as with the Specially Concurring Opinions of P.J. Lumpkin and J. Hudson, I would urge that trial courts make specific records to avoid any misperception on behalf of the defendant or confusion in the record as to the scope and limitations of the role of standby counsel. Furthermore, to avoid any misperception on behalf of a jury, I also agree that a jury instruction would be appropriate.
 

 The Honorable James Winchester, Justice of the Oklahoma Supreme Court, and the Honorable Lori Walkley, Cleveland County District Judge, are sitting by special appointment.
 

 Appellant will be referred to as Fabion throughout in order to remain consistent and to avoid confusion between Appellant and the victim.
 

 An additional defendant, Laquan Ashley, was added in an Amended Information.
 

 The appeal of this conviction was submitted to this Court on June 18, 2016. Oral argument was held on June 27, 2017.
 

 Fabion, however, in proposition eight, urges this Court to reconsider its holding that a defendant has a constitutional right to self-representation in the sentencing phase of a capital case. Fabion argues that the penalty of death is so severe and unique, that the right of self-representation in the punishment phase of a capital case does not eclipse the heightened standard of sentencing reliability required by the Eighth Amendment in death penalty cases.
 

 Our recent decision in
 
 Mitchell v. State
 
 ,
 
 2016 OK CR 21
 
 ,
 
 387 P.3d 934
 
 , is also instructive on the right of self-representation; however, the opinion had not been issued prior to Brown's trial.
 

 "The language and spirit of the Sixth Amendment contemplate that counsel, like the other defense tools guaranteed by the Amendment, shall be an aid to the willing defendant-not an organ of the State interposed between an unwilling defendant and his right to defend himself personally."
 
 Faretta,
 

 422 U.S. at 820
 
 ,
 
 95 S.Ct. at 2533
 
 .
 

 Brady v. Maryland
 
 ,
 
 373 U.S. 83
 
 , 87,
 
 83 S.Ct. 1194
 
 , 1196-97,
 
 10 L.Ed.2d 215
 
 (1963) (holding suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment).